OPINION OF THE COURT
VAN ANTWERPEN, Circuit Judge,
with whom RENDELL, FISHER, CHAGARES, JORDAN, HARDIMAN, VANASKIE, and SHWARTZ, Circuit Judges, join.
The instant appeal arises out of the warrantless installation of a Global Positioning System device (a “GPS” or “GPS device”) and subsequent surveillance by agents working for the Federal Bureau of Investigation (“FBI”) of a van while investigating multiple pharmacy burglaries. The warrantless surveillance led to evidence of the involvement of brothers Harry, Michael, and Mark Katzin (collectively, “Appellees”) in the burglaries. Slightly more than a year after the GPS installation and surveillance, the Supreme Court decided United States v. Jones, which held that the installation of a GPS device by government agents upon the exterior of a vehicle and subsequent use of that device to monitor the vehicle’s movements is a Fourth Amendment “search.” — U.S. -, 132 S.Ct. 945, 949, 181 L.Ed.2d 911 (2012). As a result, Appellees successfully moved prior to trial to suppress the evidence collected pursuant to the warrant-less GPS surveillance, effectively ending the Government’s prosecution. We conclude that the evidence is admissible under the good faith exception to the exclusionary rule and reverse the District Court’s grant of Appellees’ suppression motions.
I. BACKGROUND
In 2009 and 2010, the FBI and local police officers were investigating a series of pharmacy burglaries occurring in the greater Philadelphia area, including Delaware, Maryland, and New Jersey. The modus operandi was consistent: the *168 perpetrators, who targeted Rite Aid pharmacies, disabled alarm systems by'cutting the external telephone lines.
Eventually, Harry Katzin emerged as a suspect. A local electrician, he had recently been arrested for attempting to burglarize a Rite Aid pharmacy, and he and his brothers had criminal histories involving arrests for burglary and theft. Increasingly, investigators received reports of Harry Katzin’s involvement in suspicious activities in the vicinity of Rite Aid pharmacies.[1] Their investigation revealed the make and model of Harry Katzin’s van, as well as where he primarily parked it, and the agents sought to electronically surveil him. ' The agents conferred with an Assistant United States Attorney (“AUSA”) who advised them, in conformity with Department of Justice (“DOJ”) policy at the time, that installing a battery-powered GPS device upon Harry Katzin’s van on a public street and tracking its movements on public thoroughfares would not require a warrant. Subsequently, on December 13, 2010, without a warrant, officers magnetically attached a battery powered “slap-on” GPS device[2] onto the undercarriage of Harry Katzin’s van while it was parked on a public street.
Two days later, at approximately 10:45 p.m. on December 15, 2010, the GPS device indicated that Harry Katzin’s van had left Philadelphia and proceeded on public thoroughfares to the immediate vicinity of a Rite Aid in Hamburg, Pennsylvania. According to the GPS device, the van drove around the area before stopping and remaining stationary for over two hours. The agents contacted local police but instructed them to maintain a wide perimeter to avoid alerting the suspects. Consequently, the GPS provided the only evidence of the van’s proximity to the Rite Aid. The van left its position at nearly 3:00 a.m. and state troopers followed. Meanwhile, local police confirmed that someone had burglarized the Rite Aid and relayed this information to the troopers, who pulled over the van. Troopers found Harry Katzin at the wheel with Michael and Mark as passengers. From outside the van, troopers observed items consistent with the burglary of a Rite Aid.[3] They arrested Appellees and impounded the van. In all, the warrantless GPS surveillance lasted for two days and occurred only on public thoroughfares.
Appellees were indicted and each moved to suppress the evidence recovered from the van. They argued that the warrant-less installation and monitoring of the GPS device violated their Fourth Amendment rights pursuant to Jones. The Government argued, inter alia, that even if Jones *169 now required a warrant, the evidence should not be suppressed because the agents acted in good' faith when installing and monitoring the GPS device.
The United States District Court for the Eastern District of Pennsylvania granted Appellees’ suppression motions. United States v. Katzin, No. 11-226, 2012 WL 1646894, at *11 (E.D.Pa. May 9, 2012). The District Court' found that a warrant was required under Jones. Id. at *5-6. Relying on Davis v. United States, — U.S.-, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011), it also rejected the Government’s good faith argument, refusing to “extend the good faith exception to encompass the conduct in this ease.” Id. at *10. Finally, it concluded that, contrary to the Government’s contention, passengers Mark and Michael Katzin had standing to challenge the search of Harry Katzin’s van. Id. at *11. The Government appealed.
A panel of this Court unanimously affirmed the District Court’s conclusions that the agents’ conduct required a warrant and that all three brothers had standing. United States v. Katzin, 732 F.3d 187, 191 (3d Cir.2013), vacated by United States v. Katzin, No. 12-2548, 2013 WL 7033666 (3d Cir. Dec. 12, 2013) (granting rehearing en banc). However, the panel divided over whether the good faith exception applied and, consequently, whether suppression was appropriate. See id. at 216-41 [1] (Van Antwerpen, J., dissenting). The Government petitioned for, and we granted, rehearing en banc on the singular issue of whether the evidence recovered from Harry Katzin’s van should be shielded from suppression pursuant to the good faith exception to the exclusionary rule. Katzin, 2013 WL 7033666, at *1. We conducted the en banc rehearing on May 28, 2014.
II. DISCUSSION[4]
The Fourth Amendment mandates that
[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
U.S. Const. amend. IV. Accordingly, the Fourth Amendment only prohibits “unreasonable” searches and seizures. Skinner v. Ry. Labor Executives’ Ass’n, 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); see also Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 652, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (“[T]he ultimate measure of the constitutionality of a governmental search is ‘reasonableness.’ ”). Searches conducted absent a warrant are per se unreasonable under the Fourth Amendment, subject to certain exceptions. United States v. Harrison, 689 F.3d 301, 306 (3d Cir.2012). To deter Fourth Amendment violations, when the Government seeks to admit evidence collected pursuant to an illegal search or seizure, the judicially created doctrine known as the exclusionary rule at times suppresses that evidence and makes it unavailable at trial. Herring v. United States, 555 U.S. 135, 139, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009). However, even when the Government violates the Fourth Amendment, ill- *170 gotten evidence will not be suppressed when the good faith exception to the exclusionary rule applies. See, e.g., United States v. Leon, 468 U.S. 897, 920-26, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (refusing to exclude fruits of unreasonable search because officer acted with objective good faith on later invalidated warrant).
Consequently, we need not determine whether the agents’ conduct was an unreasonable search because, even assuming so, we conclude that the good faith exception applies, and that suppression is unwarranted.[5] However, we caution that, after Jones, law enforcement should carefully consider that a warrant may be required when engaging in such installation and surveillance. We also need not reach the issue of whether Mark and Michael Katzin have standing to challenge the agents’ conduct because, even assuming so, the outcome—admission of the evidence at trial—would remain unchanged.[6] See United States v. Stearn, 597 F.3d 540, 553 (3d Cir.2010) (noting that district court only needed to determine “standing” to the extent it held searches unreasonable); United States v. Varlack Ventures, Inc., 149 F.3d 212, 216 (3d Cir.1998) (declining to decide standing where court determined that law enforcement properly conducted warrantless search). We nevertheless acknowledge that, under the law of the Third Circuit, United States v. Mosley, 454 F.3d 249 (3d Cir.2006) appears to control.

A. The Exclusionary Rule and the Good Faith Exception

Whether to suppress evidence under the exclusionary rule is a separate question from whether the Government has violated an individual’s Fourth Amendment rights. Hudson v. Michigan, 547 U.S. 586, 591-92, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006). Despite its connection to the Fourth Amendment, there is no constitutional right to have the evidentiary fruits of an illegal search or seizure suppressed at trial. See, e.g., Davis, 131 S.Ct. at 2426 (noting that the Fourth Amendment “says nothing about suppressing evidence obtained in violation of [its] command”). The exclusionary rule is instead “a judicially created means of effectuating the rights secured by the Fourth Amendment.” Stone v. Powell, 428 U.S. 465, 482, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). Simply because a Fourth Amendment violation occurs does not mean that exclusion necessarily follows. E.g., Herring, 555 U.S. at 140, 129 S.Ct. 695. Rather, “exclusion ‘has always been our last resort, not our first impulse.’ ” Id. (quoting Hudson, 547 U.S. at 591, 126 S.Ct. 2159).
Application of the exclusionary rule is instead limited to those “unusual cases” in which it may achieve its objective: to appreciably deter governmental violations of the Fourth Amendment. Leon, 468 U.S. at 909, 918, 104 S.Ct. 3405; see also United States v. Duka, 671 F.3d 329, 346 (3d Cir.2011). To the extent the promise of admitting illegally seized evidence creates an incentive to disregard Fourth Amendment rights, the exclusionary rule removes that incentive by “forbid[ding] the use of improperly obtained *171 evidence at trial.” Herring, 555 U.S. at 139, 129 S.Ct. 695. It thereby “compelfs] respect for the [Fourth Amendment’s] constitutional guaranty.” Elkins v. United States, 364 U.S. 206, 217, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960).
However, while “[r]eal deterrent value” is necessary for the exclusionary rule to apply, there are other considerations and it alone is not sufficient. Davis, 131 S.Ct. at 2427. Deterrence must also outweigh the “substantial social costs” of exclusion. Leon, 468 U.S. at 907, 104 S.Ct. 3405. These costs often include omitting “reliable, trustworthy evidence” of a defendant’s guilt, thereby “suppressing] the truth and set[ting] [a] criminal loose in the community without punishment.” Davis, 131 S.Ct. at 2427. As this result conflicts with the “truth-finding functions of judge and jury,” United States v. Payner, 447 U.S. 727, 734, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980), exclusion is a “bitter pill,” Davis, 131 S.Ct. at 2427, swallowed only as a “last resort,” Hudson, 547 U.S. at 591, 126 S.Ct. 2159. Accordingly, to warrant exclusion, the deterrent value of suppression must overcome the resulting social costs. Davis, 131 S.Ct. at 2427.
The good faith exception to the exclusionary rule was developed to effectuate this balance and has been applied “across a range of cases.”[7] Id. at 2428. Where the particular facts of a case indicate that law enforcement officers “act[ed] with an objectively ‘reasonable good-faith belief that their conduct [was] lawful, or when their conduct involve[d] only simple, ‘isolated’ negligence,” there is no illicit conduct to deter. Id. at 2427-28 (citations omitted) (quoting Leon, 468 U.S. at 909, 104 S.Ct. 3405; Herring 555 U.S. at 137). In such circumstances, “the deterrence rationale loses much of its force and exclusion cannot pay its way.” Id. at 2428 (quoting Leon, 468 U.S. at 907 n. 6, 919, 104 S.Ct. 3405) (internal quotation marks omitted). Alternatively, where law enforcement conduct is “deliberate, reckless, or grossly negligent” or involves “recurring or systemic negligence,” deterrence holds greater value and often outweighs the associated costs. Id. at 2427-28 (quoting Herring, 555 U.S. at 144, 129 S.Ct. 695) (internal quotation marks omitted). Put differently, exclusion is appropriate only where law enforcement conduct is both “sufficiently deliberate” that deterrence is effective and “sufficiently culpable” that deterrence outweighs the costs of suppression. Herring, 555 U.S. at 144, 129 S.Ct. 695. Thus, determining whether the good faith exception applies requires courts to answer the “objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances.” Id. at 145, 129 S.Ct. 695 (quoting Leon, 468 U.S. at 922 n. 23, 104 S.Ct. 3405) (internal quotation marks omitted).

1. Davis v. United States

In Davis, the Supreme Court applied the good faith exception in the context of law enforcement officers’ reliance on judicial decisions. 131 S.Ct. at 2423-24. Specifically, Davis held that “searches conducted in objectively reasonable reliance *172 on binding appellate precedent are not subject to the exclusionary rule.” Id. Davis’ holding implicated two prior Supreme Court decisions, New York v. Belton, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981) and Arizona v. Gant, 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009).
In Belton, the Supreme Court announced a seemingly broad and permissive standard regarding searches incident to arrest. 453 U.S. at 460, 101 S.Ct. 2860 (“[W]hen a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile.” (footnote omitted)). It was widely understood that the Court had issued a bright-line rule, and that vehicle searches incident to the arrest of recent occupants were reasonable, regardless of whether the arrestee “was within reaching distance of the vehicle at the time of the search.” Davis, 131 S.Ct. at 2424. However, as Davis noted, the Supreme Court’s subsequent decision in Gant upset this interpretation of Belton. Id. at 2425. After Gant, a vehicle search incident to a recent occupant’s arrest was only constitutionally reasonable where (1) “the arrestee [was] within reaching distance of the vehicle during the search, or (2) ... the police ha[d] reason to believe that the vehicle contained] ‘evidence relevant to the crime of arrest.’ ” Id. (quoting Gant, 556 U.S. at 343, 129 S.Ct. 1710).
Before Gant, the Eleventh Circuit had been one of many federal appeals courts to read Belton as establishing a permissive rule. See United States v. Gonzalez, 71 F.3d 819, 822 (11th Cir.1996) (upholding search of vehicle conducted after recent occupant was “pulled from the vehicle, handcuffed, laid on the ground, and placed under arrest”). After Belton and Gonzalez, but before Gant, police officers in a case arising in the Eleventh Circuit arrested both the driver of a vehicle and the vehicle’s occupant, Willie Davis. 131 S.Ct. at 2425. After handcuffing and placing them in the back of separate patrol cars, officers searched the vehicle and found a revolver in Davis’ jacket. Id. The District Court denied Davis’ Fourth Amendment challenge, but during the pendency of his appeal from his conviction for possession of a firearm by a convicted felon, the Supreme Court decided Gant. Id. at 2426. Accordingly, when Davis reached the Supreme Court, it was necessary to address “whether to apply the exclusionary rule when the police conduct a search in objectively reasonable reliance on binding judicial precedent,” such as Gonzalez. Id. at 2428.
Crucial to Davis’ holding that suppression was not warranted was the “acknowledged absence of police culpability.” Id. The officers’ conduct was innocent because they “followed the Eleventh Circuit’s Gonzalez precedent to the letter” and conducted themselves “in strict compliance with then-binding Circuit law.” Id. Because “well-trained officers will and should use” a law enforcement tactic that “binding appellate precedent specifically authorizes,” evidence suppression would only serve to deter what had been reasonable police work. Id..at 2429. As this outcome was inimical to the exclusionary rule’s purpose, namely deterrence, the Supreme Court applied the good faith exception to the officers’ conduct, rendering suppression inappropriate. Id. (“About all that exclusion would deter in this case is conscientious police work.”).

B. The District Court’s Reliance on Davis

In the case at bar, the District Court refused to “stray[ ] from the limitations set forth in Davis and expand[ ] the good faith *173 exception.” Katzin, 2012 WL 1646894, at *9-10. It viewed Davis as setting forth a requirement that there be relevant binding precedent within the circuit. Id. at *7. Because no binding Third Circuit precedent specifically authorized the agents’ actions, it reasoned that applying the good faith exception would involve “[extending” the holding of Davis from binding appellate precedent to an area of unsettled law. Id. at *7, *9. Still, it acknowledged that “an argument could be made ... that the more general good faith exception language” permits “individualized determination” of whether law enforcement acted objectively reasonably in specific cases. Id. at *9. It also “hastened] to emphasize” its lack of concern that the agents acted in a “calculated or otherwise deliberately cavalier or casual manner in the hopes of just meeting the outer limits of the constitutional contours of [Appellees’] rights.” Id. at *10 n. 15. It admitted that the agents “could well profess surprise at the specific outcome of Jones.” Id. Despite these conclusions, however, the District Court refused “to move beyond the strict Davis holding,” and it suppressed the evidence against Appellees.[8] Id. at *9. Appellees urge us to adopt the District Court’s interpretation of Davis. They argue that no binding appellate precedent under Davis existed upon which the agents could reasonably rely, and they warn us to refrain from “fabricating] a new ground for application of the ‘good faith’ exception”: reliance on a “settled body of persuasive authority.” (Appellees’ Corrected Supplemental En Banc Brief (“Appellee En Banc Br.”) at 3-4.)

C. The agents acted in good faith under both Davis v. United States and the general good faith exception.

We disagree with the District Court in two respects. First, we conclude that the exclusionary rule should not apply because, at the time of the agents’ conduct in this case, the Supreme Court’s decisions in United States v. Knotts, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983) and United States v. Karo, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) were binding appellate precedent upon which the agents could reasonably have relied under Davis. In the alternative, we conclude that, under the Supreme Court’s more general good faith test, the evidence should npt be suppressed because the agents acted with a good faith belief in the lawfulness of their conduct that was “objectively reasonable.” Davis, 131 S.Ct. at 2427.

1. Knotts and Karo were binding appellate precedent upon which the agents could reasonably have relied under Davis.

As an initial matter, it is self-evident that Supreme Court decisions are binding precedent in every circuit. See, e.g., United States v. Aguiar, 737 F.3d 251, 260-61 (2d Cir.2013) (rejecting contention that “binding appellate precedent” must be in-circuit precedent). The question remains whether the agents’ reliance on Knotts and Karo was “objectively reasonable.” Davis, 131 S.Ct. at 2428. We believe it was. Although the underlying facts in the cases differed — which will nearly always be true—the rationale underpinning the Supreme Court’s decisions *174 in Knotts and Karo clearly authorized the agents’ conduct.
For a law enforcement officer’s conduct to fall under the ambit of Davis, a court must answer in the affirmative that he or she has “conduet[ed] a search [or seizure] in objectively reasonable reliance on binding judicial precedent.” Id. If that is the case, this “absence of police culpability dooms” motions to suppress evidence gathered pursuant to an allegedly illegal search or seizure. Id. The concept of “objectively reasonable reliance” for good faith purposes has been in practice since long before Davis was decided and requires answering “whether a reasonably well trained officer would have known that [a] search was illegal.... [under] all of the circumstances.... ” Leon, 468 U.S. at 922 n. 23, 104 S.Ct. 3405; see also Herring, 555 U.S. at 142, 129 S.Ct. 695 (noting that case law often refers to “objectively reasonable reliance” as “good faith”). The “circumstance” at the forefront of Davis’ analysis is the existence of binding appellate precedent, and the dispositive inquiry is whether reliance upon it is “objectively reasonable.” Davis, 131 S.Ct. at 2428.
As a threshold matter, we note that our inquiry is twofold. The agents magnetically attached a battery-operated GPS onto the undercarriage of Harry Katzin’s van and tracked its movements for two days. Jones analyzed this kind of conduct as a singular act. 132 S.Ct. at 949 (installation of GPS and its use to track vehicle are a search). However, prior to Jones, GPS or GPS-like surveillance was, for Fourth Amendment purposes, often treated as two distinct acts: (1) installation of the surveillance device, and (2) use of the device to track suspects’ movements. See, e.g., Karo, 468 U.S. at 711-13, 104 S.Ct. 3296 (analyzing Fourth Amendment implications of beeper installation); id. at 713-18, 104 S.Ct. 3296 (analyzing Fourth Amendment implications of beeper surveillance); Knotts, 460 U.S. at 279, 103 S.Ct. 1081 n.* * (granting certiorari on Fourth Amendment implications of beeper use, but passing on installation); United States v. Pineda-Moreno, 591 F.3d 1212, 1215-16 (9th Cir.2010) (analyzing GPS installation separately from use), vacated, — U.S. -, 132 S.Ct. 1533, 182 L.Ed.2d 151 (2012), remanded to 688 F.3d 1087 (9th Cir.2012). Accordingly, we analyze the reasonableness of the agents’ reliance upon binding appellate precedent under Davis with respect to both of these Fourth Amendment acts.
It was objectively reasonable for the agents to rely upon Karo in concluding that the warrantless installation of the GPS device was legal. In Karo, an agent with the Drug Enforcement Agency (“DEA”) learned that James Karo and others had ordered, for use in cocaine smuggling, fifty gallons of ether from a government informant. 468 U.S. at 708, 104 S.Ct. 3296. With the informant’s consent, the Government substituted one of the informant’s cans of ether with its own can, which contained a beeper. Id. Karo picked up the ether and took the “bugged” can into his car. Id. For over four months, DEA agents intermittently monitored the beeper to determine the location of the can. Id. at 708-10, 104 S.Ct. 3296. The Government had obtained a court order authorizing this conduct, but it was subsequently invalidated, and, on appeal, the Government did not challenge its invalidation. Id. at 708, 710, 104 S.Ct. 3296. Thus, when the case reached the Supreme Court, it presented the question whether the beeper’s warrantless installation was legal. Id. at 711, 104 S.Ct. 3296.
The Supreme Court affirmed the war-rantless installation of the beeper, holding that it infringed no Fourth Amendment rights. Id. at 713, 104 S.Ct. 3296. It *175 reasoned that the transfer to Karo of the can containing the unmonitored beeper was not a search because the transfer conveyed no information, and therefore infringed no privacy interest. Id. at 712,104 S.Ct. 3296. Nor was the transfer a seizure despite the “technical trespass on the space occupied by the beeper,” which the Court admitted was an “unknown and unwanted foreign object.” Id. In so holding, the Court broadly discredited the relevance of trespass in the context of electronic surveillance of vehicles: “[A] physical trespass is only marginally relevant to the question of whether the Fourth Amendment has been violated, ... for an actual trespass is neither necessary nor sufficient to establish a constitutional violation.” Id. at 712-13, 104 S.Ct. 3296.
The magnetic attachment of an unmonitored GPS unit onto the exterior of Harry Katzin’s vehicle, like the mere transfer of a can containing an unmonitored beeper, did not convey any information. It would have been objectively reasonable for a law enforcement officer to conclude, prior to Jones and in reliance on Karo, that such conduct was not a search because it infringed no privacy interest. The same result applies to the “trespass” of the GPS device (also an “unknown and unwanted foreign object”) upon Harry Katzin’s vehicle. It would have been objectively reasonable for a law enforcement officer to conclude that Karo’s sweeping rejection of the trespass theory applied not only the DEA agents’ elaborate ruse therein, but also to the unremarkable strategy of magnetically attaching a battery-operated GPS unit onto the exterior of a vehicle. In sum, although the facts of this case differ from Karo’s, the Supreme Court’s rationale was broad enough to embrace the agents’ conduct, and their rebanee on this binding appellate precedent was objectively reasonable under Davis.
It was also objectively reasonable for the agents to rely upon Knotts and Karo in concluding that the warrantless monitoring of the GPS device was legal. In Knotts, like Karo, law enforcement arranged for a suspect to voluntarily take into his vehicle a container that, unbeknownst to him, contained a beeper. 460 U.S. at 278, 103 S.Ct. 1081. The police thereby monitored his travels on public roads. Id. The Supreme Court rejected the defendant’s Fourth Amendment challenge to the surveillance, holding that “[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another.” Id. at 281, 103 S.Ct. 1081; see also Karo, 468 U.S. at 713-16, 721, 104 S.Ct. 3296 (reaffirming Knotts but clarifying that monitoring beeper inside private residence violates Fourth Amendment due to reasonable expectation of privacy enjoyed therein). This is so because a traveler on public streets “voluntarily convey[s]” to any observer the “particular roads” over which he travels, his “particular direction,” any stops he makes, and his “final destination.” 460 U.S. at 281-82, 103 S.Ct. 1081. The Government’s surveillance “amounted principally” to legal conduct: physically following a suspect on public roads. Id. at 281, 103 S.Ct. 1081. The beeper’s use changed little because “[njothing in the Fourth Amendment prohibited the police from augmenting [their] sensory faculties ... with such enhancement as science and technology afforded them in this case.” Id. at 282, 103 S.Ct. 1081.
With respect to surveillance, the agents here engaged in nearly identical conduct to that authorized in Knotts. Appellees “voluntarily conveyed” their travels over public roads and the information gathered by the GPS device was indistinguishable from that which physical surveillance would have revealed. See id. at 281-82, 103 S.Ct. 1081. Again, the breadth of the Supreme *176 Court’s rationale in Knotts and Karo encompasses the agents’ conduct, and we conclude that reliance upon this binding appellate precedent was objectively reasonable under Davis. In so concluding, we join a number of our sister circuits in deciding that, for the purposes of the good faith inquiry as applied to these facts, the technological distinctions between the beepers of yesteryear and the GPS device used herein are irrelevant. See Aguiar, 737 F.3d at 255, 261 (deciding that beeper •used in Knotts was “sufficiently similar” to GPS device employed for approximately six months); United States v. Sparks, 711 F.3d 58, 66 (1st Cir.2013) (concluding that “Knotts clearly authorized” law enforcement’s use, for eleven days, of GPS device instead of beeper); see also United States v. Fisher, 745 F.3d 200, 205 (6th Cir.2014) (concluding that in-circuit beeper cases were binding appellate precedent for “sporadic[ ]” GPS use); United States v. Andres, 703 F.3d 828, 835 (5th Cir.2013) (same, for approximately two-day use).
We acknowledge, of course, that these cases are not factually identical to the agents’ conduct. The agents monitored Harry Katzin’s van for two days by GPS, not beeper. They clandestinely installed a battery-operated GPS by magnetically attaching it onto the undercarriage of his van rather than clandestinely tricking him into unwittingly taking the GPS device into his vehicle. Otherwise their conduct echoed that in Knotts and Karo. No two cases will be factually identical. While the underlying facts of the cases are obviously relevant to determining whether reliance is objectively reasonable, the question is not answered simply by mechanically comparing the facts of cases and tallying their similarities and differences. Rather, Davis’ inquiry involves a holistic examination of whether a reasonable officer would believe in good faith that binding appellate precedent authorized certain conduct, which is a scenario-specific way of asking the broader question of whether the officer “act[ed] with an objectively ‘reasonable good-faith belief that [his] conduct [was] lawful.” Davis, 131 S.Ct. at 2427 (quoting Leon, 468 U.S. at 909, 104 S.Ct. 3405).
Undoubtedly, certain language in Davis invites a narrow reading, but we are not persuaded this interpretation is true to Davis’ holding. For instance, Davis found exclusion inappropriate where “binding appellate precedent specifically authorized] a particular police practice.” Id. at 2429. We construe, arguendo, this language narrowly to mean that the relied-upon case must affirmatively authorize the precise conduct at issue in the case under consideration. Stated as a syllogism, if binding appellate precedent specifically authorizes the precise conduct under consideration, then it will likely be binding appellate precedent upon which police can reasonably rely under Davis. However, this does not make the reverse syllogism true, namely, that if a case is binding appellate precedent under Davis, then it must specifically authorize the precise conduct under consideration. . Davis’ holding is broader: “[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule.” Id. While reliance is likely reasonable when the precise conduct under consideration has been affirmatively authorized by binding appellate precedent, it may be no less reasonable when the conduct under consideration clearly falls well within rationale espoused in binding appellate precedent, which authorizes nearly identical conduct.
Accordingly, what is far more important to our conclusion is that, despite these few dissimilarities, the agents’ nearly identical conduct fits squarely within the rationale of these decisions. We, therefore, believe *177 that, at the time of the conduct at issue here, Knotts and Karo were binding appellate precedent, which could reasonably be relied on, under Davis. At least one other circuit has held so and explicitly rejected the contention that binding appellate precedent must be “(1) within the Circuit and (2) specific to the facts at hand.” Aguiar, 737 F.3d at 260-61 (holding that, before Jones, Knotts and Karo were binding appellate precedent under Davis for purposes of GPS installation and surveillance of a vehicle on public roads); see also United States v. Brown, 744 F.3d 474, 478 (7th Cir.2014) (Knotts and Karo are binding appellate precedent for purposes of consensual GPS installation and subsequent surveillance).

2. Suppression is inappropriate because the agents acted under an objectively reasonable good faith belief that their conduct was lawful.

a. The alleged inapplicability of Davis does not control the issue.

Alternatively, even if we were to accept Appellees’ argument that factual dissimilarities disqualify Knotts and Karo from being “binding appellate precedent” which could reasonably be relied on under Davis, our inquiry would not end there. In advancing their contrary position, the District Court and Appellees improperly elevate Davis’ holding above the general good faith analysis from whence it came. Davis is but one application of the good faith exception that applies when police “conduct a search in objectively reasonable reliance on binding judicial precedent.” Davis, 131 S.Ct. at 2428. Undoubtedly, Davis is the most analogous Supreme Court decision to the instant circumstances. However, even if Davis did not mandate the application of the good faith exception, we can still apply the exception for another good reason. Cf. United States v. Knights, 534 U.S. 112, 117, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) (rejecting the “dubious logic ... that an opinion upholding the constitutionality of a particular search implicitly holds unconstitutional any search that is not like it”). The whole of our task is not to determine whether Davis applies, nor to “extend” either the good faith exception or Davis’ holding. Even where Davis does not control, it is our duty to consider the totality of the circumstances to answer the “objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal.”[9] Leon, 468 U.S. at 906-07, 922 n. 23, 104 S.Ct. 3405 (noting that exclusion inquiries “must be resolved, by weighing the costs and benefits of [suppression]” (emphasis added)). To exclude evidence simply because law enforcement fell short of relying on binding appellate precedent would im-permissibly exceed the Supreme Court’s mandate that suppression should occur in only “unusual” circumstances: when it *178 “furtherfs] the purposes of the exclusionary rule.” Id. at 918, 104 S.Ct. 3405; see also Duka, 671 F.3d at 346.
Davis supports this conclusion. In reaching its holding, Davis reiterates the analytical steps for evaluating suppression challenges. 131 S.Ct. at 2426-28. For example, we must limit operation of the exclusionary rule “to situations in which [its] purpose,” deterring future Fourth Amendment violations, is “most efficaciously served.” Id. at 2426 (quoting United States v. Calandra, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974)). Our analysis must account for both “[r]eal deterrent value” and “substantial social costs,” and our inquiry must focus on the “flagrancy of the police misconduct” at issue. Id. at 2427 (quoting Leon, 468 U.S. at 907, 911, 104 S.Ct. 3405). Only when, after a “rigorous weighing,” we conclude that “the deterrence benefits of suppression ... outweigh its heavy costs,” is exclusion appropriate. Id. Importantly, we must be prepared to “appl[y] this ‘good-faith’ exception across a range of cases.”[10] Id. at 2428.
Davis did not begin, nor end, with binding appellate precedent. Rather, binding appellate precedent informed — and ultimately determined — the Supreme Court’s greater inquiry: whether the officers’ conduct was deliberate and culpable enough that application of the exclusionary rule would “yield meaningfu[l] deterrence,” and “be worth the price paid by the justice system.” Id. at 2428 (alteration in original) (quoting Herring, 555 U.S. at 144, 129 S.Ct. 695) (internal quotation marks omitted). We must conduct the same analysis on the facts before us, even in the absence of binding appellate precedent.[11]
The District Court acknowledged the argument that the “general good faith exception language” could permit an “individualized determination” of whether the agents’ conduct was objectively reasonable. Katzin, 2012 WL 1646894, at *8. This determination would have been properly informed by its conclusion that the agents’ inadvertent Fourth Amendment violation was neither “calculated” nor the result of a “deliberately cavalier or casual” attitude toward Appellees’ Fourth Amendment rights, and that the agents' were likely “surprise[d]” by Jones.” Id. at *10 n. 15; see also Davis, 131 S.Ct. at 2429 (noting that the Supreme Court has “ ‘never applied’ the exclusionary rule to suppress evidence ob *179 tained as a result of nonculpable, innocent police conduct” (quoting Herring, 555 U.S. at 144, 129 S.Ct. 695)). However, the District Court declined to apply the good faith exception on the theory that doing so would implicate or “extend” the “strict Davis holding.” Id. at *9-10. This conclusion prevented the District Court from answering, as was its duty, the “objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal.... [under] all of the circumstances.... ” Leon, 468 U.S. at 922 n. 23, 104 S.Ct. 3405.

b. The Legal Landscape

In applying the good faith exception analysis to the agents’ conduct, we initially address the precise conduct at issue and the legal landscape at the time the agents acted. The agents magnetically attached a battery-operated GPS onto the undercarriage of Harry Katzin’s van and tracked its movements for two days. As noted above, we analyze the reasonableness of the agents’ conduct as would a pre-Jones court, namely, by separately considering installation and surveillance. E.g., Karo, 468 U.S. at 711-18, 104 S.Ct. 3296. '
Application of the good faith exception turns on whether the agents, at the time they acted, would have or should have known their installation of the GPS and their subsequent monitoring of Harry Katzin’s vehicle were unconstitutional. See Krull, 480 U.S. at 348-49, 107 S.Ct. 1160. Relevant to this determination are the Supreme Court’s case law dealing with electronic surveillance and general searches of automobiles, subsequent treatment of GPS or GPS-like surveillance across the federal courts, and other considerations.

i. Knotts and Karo

Until Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Supreme Court’s primary Fourth Amendment inquiry was whether the Government committed a physical trespass. See, e.g., id. at 352, 88 S.Ct. 507 (noting that the absence of trespass was onbe “thought to foreclose further Fourth Amendment inquiry”). Katz changed this, famously declaring that “the Fourth Amendment protects people, not places.” Id. at 351, 353, 88 S.Ct. 507 (“[T]he reach of [the Fourth] Amendment cannot turn upon the presence or absence of a physical intrusion-[T]he ‘trespass’ doctrine ... can no longer be regarded as controlling.”). Subsequently, Katz was widely regarded as having jettisoned reliance on physical trespass in resolving Fourth Amendment challenges. See, e.g., United States v. Santillo, 507 F.2d 629, 632 (3d Cir.1975) (noting that the “trespassory concepts” relied upon in earlier Fourth Amendment cases have been “discredited”). After Katz, the dominant Fourth Amendment inquiry became whether the Government had intruded upon a person’s reasonable expectation of privacy. See Katz, 389 U.S. at 360, 88 S.Ct. 507 (Harlan, J., concurring); see also, e.g., Rakas v. Illinois, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (noting that one’s “capacity” to invoke Fourth Amendment protections depends upon whether one has a legitimate expectation of privacy, not a property right, in the invaded place).
In Knotts and Karo, the Supreme Court applied this rationale to electronic surveillance of vehicles. We incorporate our earlier discussion of these cases, pausing only to reiterate Knotts’ conclusion that “[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another,” 460 U.S. at 281, 103 S.Ct. 1081, as well'as Karo’s broad rejection of the trespass theory in the context of electronic surveillance of vehicles: “[A] *180 physical trespass is only marginally relevant to the question of whether the Fourth Amendment has been violated, ... for an actual trespass is neither necessary nor sufficient to establish a constitutional violation.” 468 U.S. at 712-13, 104 S.Ct. 3296.
Also relevant to the installation question are the Supreme Court’s conclusions that persons do not enjoy a reasonable expectation of privacy in the exterior of their vehicles. New York v. Class, 475 U.S. 106, 114, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986) (“The exterior of a car, of course, is thrust into the public eye, and thus to examine it does not constitute a ‘search.’ ”); Cardwell v. Lewis, 417 U.S. 583, 591-92, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) (plurality opinion) (no privacy interest infringed where search examined tire on wheel and took paint scrapings from exterior of vehicle in public parking lot).
Thus, at bottom, before Jones, Knotts and Karo established that no Fourth Amendment search occurred where officers used beeper-based electronics to monitor an automobile’s movements on public roads because a person has no reasonable expectation of privacy with regard to that information. Additionally, the rationale they espoused informed the federal appeals courts’ subsequent treatment of direct installation of a GPS device onto the exterior of a vehicle.

ii. Out-of-Circuit Decisions

After Knotts and Karo, what resulted was a nearly uniform consensus across the federal courts of appeals that addressed the issue that the installation and subsequent use of a GPS or GPS-like device was not a search, or, at most, was a search but did not require a warrant. See, e.g., United States v. Marquez, 605 F.3d 604, 609-10 (8th Cir.2010) (reasoning that GPS installation and use requires only reasonable suspicion, since monitoring on public roads is not a search); Pineda-Moreno, 591 F.3d at 1215-16 (holding that mobile tracking device installation and use was not a search); United States v. Garcia, 474 F.3d 994, 997 (7th Cir.2007) (holding that GPS installation and use was not a search), abrogation recognized by United States v. Brown, 744 F.3d 474 (7th Cir.2014); United States v. McIver, 186 F.3d 1119, 1126— 27 (9th Cir.1999) (holding that GPS installation was not a search); see also United States v. Michael, 645 F.2d 252, 256-58 (5th Cir.1981) (en banc) (holding that beeper installation and use requires only reasonable suspicion, since monitoring on public roads is not a search).[12]
The lone dissenting voice was United States v. Maynard, 615 F.3d 544 (D.C.Cir. 2010), decided four months prior to the agents’ conduct here. Maynard (which became Jones on appeal to the Supreme Court) held that prolonged GPS surveillance of a vehicle “24 hours a day for four weeks” was a Fourth Amendment search because it invaded the defendant’s reasonable expectation of privacy. Id. at 555. The D.C. Circuit reasoned that Knotts held only that a person travelling by vehicle on public roads had no reasonable expectation of privacy in his movements, not that “such a person has no reasonable expectation of privacy in his movements whatsoever, world without end.” Id. at 557. Maynard thus focused on the quality and quantity of information gathered during the extended surveillance. Id. at 562 (noting that prolonged surveillance, unlike short-term surveillance, exposes “what a person does repeatedly, what he does not do, and what he does ensemble,” thereby *181 revealing more information than an isolated trip). It reasoned that the defendant’s movements were “not actually exposed to the public because the likelihood a stranger would observe all those movements is not just remote, it is essentially nil.” Id. at 560.
Thus, at the time the agents acted, in addition to the “beeper” authority of Knotts and Karo, three circuit courts expressly approved their use of a GPS or GPS-like device, and the lone dissenting voice involved surveillance of a far longer duration.

Hi. AUSA Consultation

Finally, the agents consulted with, and received approval from, an AUSA on their proposed conduct. It was DOJ policy at the time that a warrant was not required to install a battery-powered GPS on a vehicle parked on a public street and to surveil it on public roads. We have previously considered reliance on government attorneys in our good faith calculus and concluded that, based upon it in combination with other factors, “[a] reasonable officer would ... have confidence in [a search’s] validity.”[13] United States v. Tracey, 597 F.3d 140, 153 (3d Cir.2010); see also United States v. Fama, 758 F.2d 834, 837 (2d Cir.1985) (same).
Jones fundamentally altered this legal landscape by reviving—after a forty-five year hibernation— the Supreme Court’s prior trespass theory. 132 S.Ct. at 952 (declaring that reasonable expectation of privacy inquiry did .not substitute for “common-law trespassory test”). As the Ninth Circuit recently stated: “The agents in Jones labored under the misconception that the ‘reasonable expectation of privacy’ test exclusively marked the [Fourth] Amendment’s boundaries. Cases fostering that impression were ubiquitous.” United States v. Thomas, 726 F.3d 1086, 1094 n. 8 (9th Cir.2013) (citation omitted) (citing numerous Supreme Court cases).
With this legal landscape in mind, we turn now to our application of the good faith exception to the exclusionary rule.
c. Applying the Good Faith Exception
To reiterate, the exclusionary rule is a prudential doctrine designed solely to deter future Fourth Amendment violations. Davis, 131 S.Ct. at 2426. Marginal deterrence is, however, insufficient for suppression; rather, deterrence must be “appreciable,” Leon, 468 U.S. at 909, 104 S.Ct. 3405, and outweigh the heavy social costs of suppressing reliable, probative evidence, Davis, 131 S.Ct. at 2427. This balancing act pivots upon the fulcrum of the “flagrancy of the police misconduct” at issue. Id. (quoting Leon, 468 U.S. at 911, 104 S.Ct. 3405). Thus, “[w]hen the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs.” Id. (quoting Herring, 555 U.S. at 144, 129 S.Ct. 695) (internal quotation marks omitted). However, “when the police act with an objectively reasonable good-faith belief that their conduct is lawful ... the deterrence rationale loses much of its force and exclusion cannot pay its way.” Id. at 2427-28 (quoting Leon, 468 U.S. at 907 n. 6, 909, 919, 104 S.Ct. 3405) (internal quotation marks omitted).
*182 Accordingly, we must determine whether — on these particular facts — the agents acted with a good faith belief in the lawfulness of their conduct that was “objectively reasonable.” Id. If so, suppression is unwarranted. If, on the other hand, the agents “had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment,” suppression is warranted. Krull, 480 U.S. at 348-49, 107 S.Ct. 1160. When answering these questions, we consider “all of the circumstances” and confine our inquiry to the “objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal” in light of that constellation of circumstances. Leon, 468 U.S. at 922 n. 23, 104 S.Ct. 3405.
We conclude that when the agents acted, they did so upon an objectively reasonable good faith belief in the legality of their conduct, and that the good faith exception to the exclusionary rule therefore applies. The constellation of circumstances that appeared to authorize their conduct included well settled principles of Fourth Amendment law as articulated by the Supreme Court, a near-unanimity of circuit courts applying these principles to the same conduct, and the advice of an AUSA pursuant to a DOJ-wide policy. Given this panoply of authority, we cannot say that a “reasonably well trained officer would have known that the search was illegal,” id., nor that the agents acted with “deliberate, reckless, or grossly negligent disregard for [Appel-lees’] Fourth Amendment rights,” Davis, 131 S.Ct. at 2427 (quoting Herring, 555 U.S. at 144, 129 S.Ct. 695) (internal quotation marks omitted). Thus, suppression is inappropriate because it would not result in deterrence appreciable enough to outweigh the significant social costs of suppressing reliable, probative evidence, upon which the Government’s entire case against Appellees turns. See Leon, 468 U.S. at 909, 104 S.Ct. 3405.

i. Knotts and Karo

Knotts and Karo are seminal cases on the intersection of electronic surveillance of vehicles and the Fourth Amendment. Before Jones, their conclusion that the Fourth Amendment was not implicated by the installation and use of a beeper to surveil vehicles on public thoroughfares, and the rationale that supported it, was hornbook law. See, e.g., Aguiar, 737 F.3d at 261 (“Karo’s brushing off of the potential trespass fits logically with earlier Supreme Court decisions concluding that ‘the physical characteristics of an automobile and its use result in a lessened expectation of privacy therein.’ ” (quoting Class, 475 U.S. at 112, 106 S.Ct. 960)); Sparks, 711 F.3d at 67 (“Knotts was widely and reasonably understood to stand for the proposition that the Fourth Amendment simply was not implicated by electronic surveillance of public automotive movements .... ”). The agents would have been objectively reasonable to conclude that monitoring Harry Katzin’s van was constitutional, in large part, because it fell squarely within Knotts and Karo’s well-accepted rationale. Their targets were “person[s] travelling in an automobile on public thoroughfares,” who had “no reasonable expectation of privacy in [their] movements from one place to another.” Knotts, 460 U.S. at 281, 103 S.Ct. 1081. It is undisputed that Appellees “voluntarily convey[ed]” to any observer the “particular roads” over which they traveled, their “particular direction,” their stops, and their “final destination.” Id. at 281-82, 103 S.Gt. 1081. At no time did the GPS permit the agents to monitor inside “a private residence” or other area “not open to visual surveillance.” Karo, 468 U.S. at 714, 721, 104 S.Ct. 3296.
*183 Additionally, the agents would have been objectively reasonable to believe that installing the GPS device implicated no Fourth Amendment rights. The Supreme Court had repeatedly stated that persons do not enjoy a reasonable expectation of privacy in the exterior of their vehicles. Class, 475 U.S. at 114, 106 S.Ct. 960; see also Cardwell, 417 U.S. at 591, 94 S.Ct. 2464. It was also objectively reasonable for the agents to believe that installing a GPS was safe from a trespass challenge. Katz clearly stated that Fourth Amendment inquiries did not “turn upon the presence or absence of a physical intrusion.” 389 U.S. at 358, 88 S.Ct. 507. The trespass doctrine had been “discredited.” Santillo, 507 F.2d at 632.
The agents also benefitted from Supreme Court precedent addressing trespass in the context of electronic surveillance of vehicles on public roads. Although Karo did not address direct installation, its renunciation of the trespass theory was broad enough for agents reasonably to conclude that the installation was “only marginally relevant” to Appellees’ Fourth Amendment rights and alone was “neither necessary nor sufficient to establish a constitutional violation.” 468 U.S. at 712-13, 104 S.Ct. 3296. They could have reasonably believed that the only constitutionally significant act they engaged in was monitoring. Id. at 713, 104 S.Ct. 3296 (rejecting trespass theory and noting that privacy violation, if any, was “occasioned by the monitoring of the beeper”). And, as discussed, the agents had no reason to believe the monitoring was illegal.

ii. Oui^of-Circuit Decisions

The agents’ conduct also conformed to practices authorized by a “uniform treatment” of “continuous judicial approval” of warrantless GPS installation and use across the federal courts. See Peltier, 422 U.S. at 540-42 & n. 8, 95 S.Ct. 2313 (holding exclusionary rule inapplicable where illegal search was conducted in good faith reliance on, in part, holdings and dicta of various courts of appeals).[14] Specifically, when the agents acted, the Seventh,[15] Eighth,[16] and Ninth[17] Circuits had all held that the installation of GPS or GPS-like devices upon the exterior of vehicles and their subsequent monitoring either was not a search or, at most, was a search but did not require a warrant.[18] Their rationales were based on the same Supreme Court *184 precedents we outline above, particularly Knotts.
By considering these non-binding decisions in our good faith analysis, we do no more than did the Supreme Court in Peltier. There, the Court considered the “constitutional norm” established by the courts of appeals when determining whether an officer “had knowledge, or [could] properly be charged with knowledge, that [a] search was unconstitutional under the Fourth Amendment.” Id. at 542, 95 S.Ct. 2313 (“[U]nless we are to hold that parties may not reasonably rely upon any legal pronouncement emanating from sources other than this Court, we cannot regard as blameworthy those parties who conform their conduct to the prevailing ... constitutional norm.”).[19]

in. AUSA Consultation

Finally, the agents’ consultation with the AUSA also supports our conclusion that a reasonable agent would have believed in good faith that the installation and surveillance of Harry Katzin’s vehicle was legal. Of course, the AUSA approved their conduct. But more importantly, the AUSA’s advice was given pursuant to a DOJ-wide policy — presumably based upon the legal landscape we describe above — that the agents’ conduct did not require a warrant. Prosecutors are, of course, not “neutral judicial officers.” Leon, 468 U.S. at 917, 104 S.Ct. 3405. We do not place undue weight on this factor, but we have previously considered it in our good faith analysis. Tracey, 597 F.3d at 153; see also United States v. Otero, 563 F.3d 1127, 1134-35 (10th Cir.2009).
In light of the aforementioned legal landscape, when the agents installed the GPS device onto the undercarriage of Harry Katzin’s vehicle, and then used that device to monitor his vehicle’s movements on public thoroughfares for two days, we believe those agents exhibited “an objectively ‘reasonable good-faith belief that their conduct [was] lawful.” Davis, 131 S.Ct. at 2427 (quoting Leon, 468 U.S. at 909, 104 S.Ct. 3405). Given the panoply of authority authorizing their actions, we cannot conclude that a “reasonably well trained officer would have known that the search was illegal,” Leon, 468 U.S. at 922 n. 23, 104 S.Ct. 3430, nor that the agents acted with a “deliberate, reckless, or grossly negligent disregard for [Appel-lees’] Fourth Amendment rights,” Davis, 131 S.Ct. at 2427 (quoting Herring, 555 U.S. at 144, 129 S.Ct. 695) (internal quotation marks omitted). Prior to Jones’ unforeseeable revival of the “discredited” trespass theory, Santillo, 507 F.2d at 632, a reasonable police officer would have concluded that the agents’ conduct did not require a warrant. Suppression in this case would only deter “conscientious police work.” Id. at 2429. Accordingly, suppression of the evidence discovered as a result of the agents’ conduct would not “outweigh the resulting costs,” and “exclusion cannot ‘pay its way.’” Id. at 2427-28 (quoting Leon, 468 U.S. at 907 n. 6, 104 S.Ct. 3405).[20]

*185
d. Appellees’ Arguments

Appellees argue that excluding the evidence against them would achieve appreciable deterrence because it would prevent investigators and prosecutors from “engaging in overly aggressive reading's of non-binding authority” and deter law enforcement from “ *act[ing] in a constitutionally reckless fashion’ by taking constitutional inquiries into their own hands.” (Appellee En Banc Br. at 5 (quoting Katzin, 732 F.3d at 212).) To so hold would lead to the same result as the District Court’s erroneous application of Davis: the good faith exception would not apply unless our own Court had established binding appellate precedent directly on point and approving the officer’s conduct. Put differently, all innocently (though later deemed illegally) gathered evidence would be excluded unless the police conduct discovering it was expressly permitted at the time the conduct occurred. But the purpose of the exclusionary rule is to deter “wrongful police conduct.” Herring, 555 U.S. at 137, 129 S.Ct. 695. And exclusion is only appropriate when doing so “most efficaciously serve[s]” that purpose. Ca-landra, 414 U.S. at 348, 94 S.Ct. 613. The mere act of deciding that conduct is lawful based upon a “constitutional norm” rather than binding appellate precedent is unlike the highly culpable conduct that helped establish the exclusionary rule. See, e.g., Herring, 555 U.S. at 143, 129 S.Ct. 695 (listing cases and noting that “the abuses that gave rise to the exclusionary rule featured intentional conduct that was patently unconstitutional”).
No doubt, sometimes officers’ reliance on non-binding authorities will fall short of an “objectively reasonable” good faith belief in the legality of their conduct. Suppression may then be appropriate to deter such reliance. It is equally elementary that close cases will be difficult.[21] But in many other cases, law enforcement will likely correctly conclude, based upon a panoply of non-binding authority establishing a “constitutional norm,” Peltier, 422 U.S. at 542, 95 S.Ct. 2313, that a particular police practice does not violate the Fourth Amendment. The value in deterring such conduct is low. Additionally, adopting such a bright-line rule may impermissibly *186 avoid our duty to conduct in each case a “rigorous weighing” of suppression’s costs and benefits, Davis, 131 S.Ct. at 2427, and to consider “all of the circumstances” to determine the “objectively ascertainable .question whether a reasonably well trained officer would have known that the search was illegal,” Leon, 468 U.S. at 922 n. 23, 104 S.Ct. 3405. We would also risk “gener-at[ing] disrespect for the law and administration of justice” by applying the exclusionary rule so indiscriminately. Id. at 908, 104 S.Ct. 3405 (quoting Stone, 428 U.S. at 491, 96 S.Ct. 3037).
Because such a bright-line rule would supplant the required balancing act, we would have to be confident that in every conceivable future case, the substantial costs of suppression would be outweighed by the value of deterring police from relying on a “constitutional norm” simply because it had yet to be expressly established by precedential opinion in the Third Circuit. We have no such confidence and Appellees do little to assuage our concerns. Appellees’ good faith calculus conspicuously fails to confront the “cost” side of the equation, which they dismiss as “minimal.” (Appellee En Banc Br. at 8.) However, the Supreme Court has routinely stated the opposite; the cost of suppression is “substantial,” Leon, 468 U.S. at 907, 104 S.Ct. 3405, because it often excludes “reliable, trustworthy evidence” of a defendant’s guilt, “suppress[es] the truth and set[s] [a] criminal loose in the community without punishment,” Davis, 131 S.Ct. at 2427. Here, by all appearances, the Government’s evidence against Appellees is substantial, and it is uncontested that the Government would have no case without it. The costs of exclusion are high.
The boundaries of the good faith exception are a sufficient deterrent to the conduct Appellees find objectionable. Law enforcement personnel will either tread cautiously or risk suppression.[22] The legal authority relied upon must support an “objectively reasonable good faith belief’ that specific conduct is constitutional. Id. (quoting Leon, 468 U.S. at 909, 104 S.Ct. 3405) (internal quotation mark omitted). Consequently, nothing in our holding today conflicts with the Supreme Court’s instructions to executive officers to “err on the side of constitutional behavior,” United States v. Johnson, 457 U.S. 537, 561, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982), and in “doubtful or marginal case[s]” to obtain a warrant, Leon, 468 U.S. at 914, 104 S.Ct. 3405 (quoting United States v. Ventresca, 380 U.S. 102, 106, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965)). We do not believe this case to be either doubtful or marginal.[23]
In any event, just because law enforcement officers may one day unreasonably *187 rely on non-binding authority does not absolve us of our duty to decide whether, under these facts, the agents’ conduct was “sufficiently deliberate” that deterrence will be effective and “sufficiently culpable” that deterrence outweighs the costs of suppression. Herring, 555 U.S. at 144, 129 S.Ct. 695. In this case neither standard is satisfied. Future decisions may reveal that applying the good faith exception to reliance on non-binding authority should be extremely rare, perhaps as rare as tectonic shifts in Fourth Amendment jurisprudence such as Jones. See Davis, 131 S.Ct. at 2433 (noting the infrequency with which the Supreme Court overrules its Fourth Amendment precedents). But that is a question for another day.
III. CONCLUSION
For the foregoing reasons, we reverse the order of the District Court suppressing the evidence discovered in Harry Katzin’s van and remand for further proceedings consistent with this opinion.

.For example, in October 2010 Pennsylvania police found Harry Katzin crouching behind bushes near a Rite A id. They did not arrest him but the following day discovered the Rite Aid’s phone lines had been cut. A month later, police searched Harry Katzin’s van after discovering him and two other individuals (including his brother Michael) sitting inside it near a Rite A id. Police found tools, work gloves, and ski masks in the van but did not arrest the men. Again, police later discovered the Rite Aid's phone lines were cut. Finally, that same month, surveillance camera footage from a burglarized New Jersey Rite Aid showed a van similar to Harry Katzin’s parked in its vicinity.

. A "slap-on” GPS device magnetically attaches to a vehicle’s exterior and is battery powered, requiring no electrical connection to the vehicle. It uses a network of satellites to calculate its location and transmits the data to a central server. An officer need not physically track nor be near the automobile. The GPS that the agents used had a battery life of one week (although the agents could have changed the batteries, if necessary).

. The state trooper saw merchandise, pill bottles, Rite Aid storage bins, tools, a duffel bag, and a surveillance system with severed wires.

. The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction under 18 U.S.C. § 3731 and 28 U.S.C. § 1291. In reviewing a motion to suppress, "we review a district court’s factual findings for clear error, and we exercise de novo review over its application of the law to those factual findings.” United States v. Pavulak, 700 F.3d 651, 660 (3d Cir.2012).

. This approach is consistent with that taken by our sister circuits when addressing the installation and use of GPS or GPS-like devices that occurred prior to Jones. See, e.g., United States v. Brown, 744 F.3d 474, 476 (7th Cir.2014); United States v. Aguiar, 737 F.3d 251, 255 (2d Cir.2013); United States v. Andres, 703 F.3d 828, 834 (5th Cir.2013); United States v. Pineda-Moreno, 688 F.3d 1087, 1090 (9th Cir.2012).

. We use the term "standing” as shorthand for determining whether a litigant's Fourth Amendment rights are implicated. See United States v. Mosley, 454 F.3d 249, 253 n. 5 (3d Cir.2006).

. See Davis, 131 S.Ct. at 2429 (applying good faith exception where officers relied on binding appellate precedent); Herring, 555 U.S. at 147-48, 129 S.Ct. 695 (same, with police-maintained outstanding warrant database); Arizona v. Evans, 514 U.S. 1, 14-16, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995) (same, with court-maintained database); Illinois v. Krull, 480 U.S. 340, 349-50, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987) (same, with subsequently invalidated statute); Leon, 468 U.S. at 922, 104 S.Ct. 3405 (same, with subsequently invalidated warrant).

. The District Court relied on "policy issues” it believed militated against "[ejxtending Davis " and applying the good faith exception. Katzin, 2012 WL 1646894, at *9. Specifically, it questioned the practicality of assigning authoritative weight to out-of-circuit decisions, noted that the good faith exception generally involved "reliance on unequivocally binding legal authority,” and concluded that reliance on out-of-circuit authority "at least border[ed] on being categorized as systemic negligence.” Id.

. The District Court noted that the Supreme Court’s good faith decisions generally involved reliance on some "unequivocally binding” authority, which does not include nonbinding case law. Katzin, 2012 WL 1646894, at *9; see also supra note 7. However, in the Supreme Court’s many enunciations of the governing standard, it has never made such authority a condition precedent to applying the good faith exception. See, e.g., Herring, 555 U.S. at 137, 129 S.Ct. 695 (noting that suppression “turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct”); Evans, 514 U.S. at 13-14, 115 S.Ct. 1185 (suppression appropriate "only if the remedial objectives of the rule are thought most efficaciously served”); Leon, 468 U.S. at 918, 104 S.Ct. 3405 (good faith exception requires "objectively reasonable belief that ... conduct did not violate the Fourth Amendment”). We do no more than apply the good faith exception as articulated by the Supreme Court.

. Moreover, we note that Justice Sotomayor understood Davis explicitly to leave open the question “whether the exclusionary rule applies when the law governing the constitutionality of a particular search is unsettled.” Davis, 131 S.Ct. at 2435 (Sotomayor, J., concurring). Similarly, Justice Breyer did not read Davis to limit the good faith exception only to "binding appellate precedent.” Id. at 2439 (Breyer, J., dissenting) (arguing that culpability rationale could similarly excuse as good faith a search which an officer "believes complies with the Constitution but which ... falls just outside the Fourth Amendment’s bounds [or] where circuit precedent is simply suggestive rather than ‘binding,’ where it only describes how to treat roughly analogous instances, or where it just does not exist”).

. Appellees’ warning not to "fabricate” a new good faith ground exemplifies this misreading of Davis. (Appellee En Banc Br. at 4.) The Davis Court did not "fabricate” binding appellate precedent as a ground for applying the good faith exception. The facts involved binding appellate precedent, but the ground for applying the good faith exception was — as it has been since Leon—that the deterrence rationale was unsatisfied. Davis, 131 S.Ct. at 2428-29 (noting the “absence of police culpability” and that excluding evidence would deter only "objectively reasonable law enforcem'ent activity” (quoting Leon, 468 U.S. at 919, 104 S.Ct. 3405)). The factual circumstances before us differ, but we ground our application of the good faith exception in the same time-tested considerations.

. Michael was also Eleventh Circuit law. See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc) (Fifth Circuit decisions before October 1, 1981 bind Eleventh Circuit). Michael was decided May 11, 1981. 645 F.2d at 252.

. At oral argument before the original panel, counsel for Appellee Mark Katzin conceded that we may properly consider the AUSA consultation in the totality of circumstances informing our good faith analysis. Transcript of Oral Argument at 52, United States v. Katzin, 732 F.3d 187 (3d Cir.2013), vacated by United States v. Katzin, No. 12-2548, 2013 WL 7033666 (3d Cir. Dec. 12, 2013) (No. 12-2548).

. Although Peltier was applying the “old ret-roactivity regime" of Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), Leon “explicitly relied on Peltier and imported its reasoning into the good-faith inquiry." Davis, 131 S.Ct. at 2431-32.

. Garcia, 474 F.3d at 997-98.

. Marquez, 605 F.3d at 609-10.

. Pineda-Moreno, 591 F.3d at 1215-17; McIver, 186 F.3d at 1126-27.

. The D.C. Circuit in Maynard broke from this consensus and held that prolonged GPS surveillance of the defendant’s vehicle "24 hours a day for four weeks" was a Fourth Amendment search. 615 F.3d at 555. The D.C. Circuit explicitly tailored its holding to the fact that surveillance of the defendant lasted for a month. Id. at 558, 560 (“Applying the foregoing analysis to the present facts, we hold the whole of a person's movements over the course of a month is not actually exposed to the public....”). It also relied exclusively on a reasonable expectation of privacy rationale, giving no hint at Jones’ revival of the trespass theory. Id. at 559-61. We cannot conclude that from this sole departure from the consensus of the courts of appeals "a reasonably well trained officer would [or should] have known" that the more limited GPS surveillance in this case was illegal. Leon, 468 U.S. at 922 n. 23, 104 S.Ct. 3405.

. This Court has also previously noted — albeit in limited ways — supportive out-of-circuit decisions in its good faith analyses. See, Pavulak, 700 F.3d at 664 (holding that officer relied in good faith upon warrant and noting that "the affidavit’s allegations would have been sufficient in the Eighth Circuit at the time"); Duka, 671 F.3d at 347 n. 12 (concluding that objective reasonableness of reliance on statute was “bolstered” by out-of-circuit decisions reviewing particular provision and declaring it constitutional).

. Our sister circuits' complementary conclusions support this result. See Brown, 744 F.3d at 478 (Knotts and Karo are binding appellate precedent for purposes of consensual GPS installation and subsequent surveillance); Aguiar, 737 F.3d at 261 (same, for purposes of nonconsensual installation and *185 subsequent surveillance); Sparks, 711 F.3d at 67 (Knotts is binding appellate precedent where police install GPS and surveil vehicle’s movements). Although the Seventh Circuit left open the question of non consensual GPS installation, it strongly suggested that applying the good faith exception would be appropriate based upon out-of-circuit authority. Brown, 744 F.3d at 478 (doubting deterrent effect of prohibiting police from relying on out-of-circuit authority "just because the circuit ... lacks its own precedent”). We also note that the First Circuit did not clearly distinguish where its reliance on Knotts ended and reliance on its own precedent began. See Sparks, 711 F.3d at 67 (relying on both Knotts and United States v. Moore, 562 F.2d 106 (1st Cir.1977), abrogation recognized by United States v. Oladosu, 744 F.3d 36 (1st Cir.2014)). However, it relied on Knotts for the same reasons We highlight. See id. at 66-67 (declaring that Knotts was “widely and reasonably understood” to mean electronic surveillance of vehicles on public roads did not implicate Fourth Amendment and that it "clearly authorized” use of GPS in place of beeper). Finally, as noted earlier, our sister circuits have routinely concluded, as we do on these facts, that there is no relevant distinction between beepers and GPS devices for good faith purposes.

. We are unpersuaded by Appellees’ warning that our holding will require a “complicated judgment about whether non-binding case law is sufficiently ‘settled’ and persuasive.’ ” (Appellee En Banc Br. at 6.) The Fourth Amendment routinely requires courts to make difficult determinations of reasonableness. See, e.g., Scott v. Harris, 550 U.S. 372, 383, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (noting that the Fourth Amendment requires courts to "slosh ... through the factbound morass of ‘reasonableness’ ”).

. As the Supreme Court noted in Leon, "the possibility that illegally obtained evidence may be admitted in borderline cases is unlikely to encourage police instructors to pay less attention to fourth amendment limitations .... [nor] encourage officers to pay less attention to what they are taught, as the requirement that the officer act in 'good faith' is inconsistent with closing one's mind to the possibility of illegality.” 468 U.S. at 919 n. 20, 104 S.Ct. 3405 (quoting Jerold Israel, Criminal Procedure, the Burger Court, and the Legacy of the Warren Court, 75 Mich. L.Rev. 1319, 1412-13 (1977)). The Supreme Court has also recognized the “increasing evidence that police forces across the United States take the constitutional rights of citizens seriously.” Hudson, 547 U.S. at 599, 126 S.Ct. 2159.

. Appellees also argue that, under our holding, courts will “defer to 'adjuncts of the law enforcement team’ on the difficult question of whether a particular legal issue is the subject of 'settled' and 'persuasive' law.” (Appellee En Banc Br. at 7.) The good faith analysis is not deferential. That courts may be required to consider whether reliance on nonbinding authority is objectively reasonable does not change the governing inquiry.