IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

————————————

**STATE OF ARIZONA,**
*Appellee,*

*v.*

**COURTNEY NOELLE WEAKLAND,**
*Appellant.*

————————————

No. CR-17-0615-PR
Filed February 25, 2019

————————————

Appeal from the Superior Court in Pima County
The Honorable Casey F. McGinley, Judge Pro Tempore
No. CR20153118-001
**AFFIRMED**

Opinion of the Court of Appeals, Division Two
244 Ariz. 79 (App. 2017)
**VACATED**

————————————

COUNSEL:

Mark Brnovich, Arizona Attorney General, Dominic E. Draye, Solicitor General, Joseph T. Maziarz, Chief Counsel, Mariette S. Ambri (argued), Assistant Attorney General, Criminal Appeals Section, Tucson, Attorneys for State of Arizona

Dean J. Brault, Legal Defender, Robb P. Holmes (argued), Assistant Legal Defender, Pima County Legal Defender's Office, Tucson, Attorneys for Courtney Noelle Weakland

Mary C. Trejo, Tucson Public Defender, Kristina J. Bohn, Supervising Public Defender, Tucson, Attorneys for Amicus Curiae Tucson Public Defender's Office

David J. Euchner (argued), Pima County Public Defender's Office, Tucson; and Joseph P. St. Louis, Nesci & St. Louis, P.L.L.C., Tucson, Attorneys for

Amici Curiae Arizona Attorneys for Criminal Justice and National College for DUI Defense

———————

JUSTICE LOPEZ authored the opinion of the Court, in which VICE CHIEF JUSTICE BRUTINEL and JUSTICES TIMMER and GOULD joined. JUSTICE PELANDER dissented. JUSTICE BOLICK, joined by CHIEF JUSTICE BALES, separately dissented.

———————

JUSTICE LOPEZ, opinion of the Court:

¶1 We here consider whether the good-faith exception to the exclusionary rule applies, in a prosecution for driving under the influence ("DUI"), to admit blood evidence unconstitutionally obtained after *State v. Butler*, 232 Ariz. 84 (2013), but before *State v. Valenzuela* (*Valenzuela II*), 239 Ariz. 299 (2016). We hold that the good-faith exception applies because application of the exclusionary rule in these circumstances would not meaningfully deter police misconduct. *Butler* did not "unsettle" the law, and it is unreasonable to require police to predict a change in the law when our trial and appellate courts failed to do so.

I.

¶2 In February 2015, an Oro Valley police officer arrested Courtney Weakland for DUI. The officer handcuffed her, put her in the back seat of his patrol car, and read her an "admin per se" form pursuant to A.R.S. § 28-1321. The form provided that Arizona law "require[d]" her to complete certain tests to determine her blood-alcohol concentration ("BAC"). She submitted to a blood draw, which revealed a BAC of .218, nearly three times the legal limit. Weakland was indicted on one count of aggravated DUI while impaired to the slightest degree and one count of aggravated DUI with a BAC of .08 or more.

¶3 Before trial, Weakland moved to suppress all evidence obtained through the warrantless search and seizure of her blood sample, arguing that the "requirement" language in the admin per se admonition coerced her consent. The trial court summarily denied her motion. Weakland was convicted on both counts.

¶4        On appeal, Weakland argued that, pursuant to *Valenzuela II*, her blood was obtained without a warrant and without valid consent, and that the good-faith exception recognized in *Valenzuela II* did not apply. The State implicitly conceded on appeal that Weakland's consent to the blood draw was involuntary and, thus, invalid pursuant to *Valenzuela II*, but argued that the good-faith exception to the exclusionary rule obviated the need to suppress the blood evidence. In a divided opinion, the court of appeals affirmed. *State v. Weakland*, 244 Ariz. 79 (App. 2017). The majority reasoned that, because Arizona courts had not held that the admin per se admonition was "coercive, ineffective, or otherwise [affirmatively] negated consent" until *Valenzuela II*, police acted in good faith when they read it to Weakland after her arrest. *See id.* at 83 ¶ 19, 85 ¶ 24. The dissent argued that although existing precedent may have justified applying the good-faith exception to the defendant's 2012 arrest in *Valenzuela II*, this Court's 2013 *Butler* decision placed police on notice before Weakland's 2015 arrest that use of the admin per se admonition was constitutionally suspect. *Id.* at 85 ¶¶ 27–28 (Eckerstrom, C.J., dissenting). The applicability of the good-faith exception to the exclusionary rule for cases involving use of the admin per se admonition after *Butler*, but before *Valenzuela II*, is a recurring issue of statewide importance. We have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution.

## II.

¶5        "We review the denial of a motion to suppress evidence for abuse of discretion, considering the facts in the light most favorable to sustaining the ruling." *Valenzuela II*, 239 Ariz. at 302 ¶ 9. We review de novo the applicability of the good-faith exception. *State v. Havatone*, 241 Ariz. 506, 509 ¶ 11 (2017).

¶6        "The exclusionary rule, which allows suppression of evidence obtained in violation of the Fourth Amendment, is a prudential doctrine invoked [solely] to deter future violations." *Valenzuela II*, 239 Ariz. at 308–09 ¶ 31 (citing *Davis v. United States*, 564 U.S. 229, 236–37 (2011)). "Exclusion is 'not a personal constitutional right,' nor is it designed to 'redress the injury' occasioned by an unconstitutional search." *Davis*, 564 U.S. at 236 (quoting *Stone v. Powell*, 428 U.S. 465, 486 (1976)). Because "a deterrence purpose can only be served when the evidence to be suppressed is derived from a search which the [police] knew or should have known was unconstitutional under the Fourth Amendment," *United States v.*

*Johnson*, 457 U.S. 537, 565 (1982) (White, J., dissenting), the rule is intended to deter only "deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Herring v. United States*, 555 U.S. 135, 144 (2009). Therefore, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence," the good-faith exception applies because "the deterrence rationale loses much of its force, and exclusion cannot pay its way." *Davis*, 564 U.S. at 238 (internal citations and quotation marks omitted); *see also* A.R.S. § 13-3925 (codifying good-faith exception to the exclusionary rule).

¶7        "Real deterrent value is a 'necessary condition for exclusion,' but it is not 'a sufficient' one." *Davis*, 564 U.S. at 237 (quoting *Hudson v. Michigan*, 547 U.S. 586, 596 (2006)). "For exclusion to be appropriate, the deterrence benefits of suppression must [also] outweigh its heavy costs." *Id.* (noting that exclusion's "bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment"). Consequently, exclusion of evidence should be a "last resort." *Id.* (quoting *Hudson*, 547 U.S. at 591). The state bears the burden of establishing that the good-faith exception applies. *Havatone*, 241 Ariz. at 511 ¶ 19.

### III.

¶8        This case turns on whether police objectively, reasonably relied on "binding appellate precedent" in using the admin per se admonition at the time of Weakland's arrest after *Butler* but before *Valenzuela II*. *See Havatone*, 241 Ariz. at 512 ¶ 24. Stated differently, we must determine whether the law regarding the admonition was "unsettled" at the time of Weakland's arrest, meaning law enforcement officers could not rely on precedent to authorize the illegal search. *Id.* at 512–13 ¶ 29 (citing *Davis*, 564 U.S. at 250 (Sotomayor, J., concurring in the judgment)). When making this assessment, we do not require police to have a "crystal ball" in determining what courts may conclude in future cases but rather require them to act in objectively reasonable reliance on then-existing authority. *State v. Jean*, 243 Ariz. 331, 343 ¶ 45 (2018); *see United States v. Leon*, 468 U.S. 897, 919 n.20 (1984) (stating that the good-faith exception requires that police have "a reasonable knowledge of what the law prohibits").

4

**¶9** Mindful of tension between *Havatone* and *Jean*, we clarify the standard for the good-faith exception. We noted in *Havatone* that "*Davis* instructs that law enforcement acts in good faith if 'binding appellate precedent specifically *authorizes* a particular police practice.'" 241 Ariz. at 512 ¶ 24 (quoting *Davis*, 564 U.S. at 241). Although an accurate statement, *Davis* did not limit the good-faith exception only to circumstances when appellate precedent specifically authorizes a police practice. In fact, in *Jean*, we rejected the proposition that "to qualify as 'binding appellate precedent under *Davis*,' a case 'must specifically authorize the precise conduct under consideration.'" 243 Ariz. at 343 ¶ 45 (quoting *United States v. Katzin*, 769 F.3d 163, 173–76 (3d Cir. 2014)). Instead, we concluded that the good-faith exception applies if the search was "conducted in objectively reasonable reliance on . . . binding appellate precedent . . . ." *Jean*, 243 Ariz. at 343 ¶ 47; *see also Valenzuela II*, 239 Ariz. at 309 ¶ 31 ("[W]hen law enforcement officers 'act with an objectively reasonable good-faith belief that their conduct is lawful,' deterrence is unnecessary and the exclusionary rule does not apply." (quoting *Davis*, 564 U.S. at 238)). We find *Jean*'s approach more consistent with *Davis*'s reasoning and the purpose of the exclusionary rule and the good-faith exception to it. *See Davis*, 564 U.S. at 240–41, 249 (reasoning that the exclusionary rule does not apply where police reasonably rely on binding appellate precedent because "[p]olice practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield 'meaningfu[l]' deterrence, and culpable enough to be 'worth the price paid by the justice system'" (alteration in original) (citations omitted)). We see no reason to limit the good-faith exception to police practices that appellate precedent specifically authorizes when the rationale for the exception applies with equal force where binding appellate precedent otherwise supports the practice. To the extent that *Havatone* and *Jean* conflict, and despite Justice Bolick's reliance on the "specific authorization" standard, *infra* ¶¶ 41, 48, we reaffirm *Jean*'s reasonableness approach.

**¶10** Weakland contends that the good-faith exception does not apply in her case because *Butler* "unsettled" the law. We are unpersuaded. Although in *Havatone* we embraced the somewhat opaque concept (at least in its application) that the good-faith exception should not apply when the law is "unsettled" as to the constitutionality of a police practice, 241 Ariz. at 512–13 ¶ 29, merely branding the state of the law between *Butler* and *Valenzuela II* as "unsettled" does not repudiate Arizona's appellate courts' repeated authorization of the admin per se admonition.

¶11 The gravamen of Weakland's argument is that the good-faith exception should not apply to her case because, after *Butler*, the police should have known that administering the admin per se admonition, pursuant to § 28-1321, would be insufficient as an exception to the Fourth Amendment's warrant requirement or would be insufficient, by itself, to establish voluntary consent to the test. In other words, if *Butler* did not expressly invalidate use of the admonition, it at least "unsettled" the law. Either way, Weakland contends, *Butler* put police on notice that use of the form was constitutionally dubious. We disagree.

¶12 The issue in *Butler* was "whether the Fourth Amendment . . . requires that a juvenile arrestee's consent be voluntary to allow a warrantless blood draw." 232 Ariz. at 86 ¶ 1. Applying *Missouri v. McNeely*, 569 U.S. 141 (2013), this Court held that the Fourth Amendment requires that, "independent of § 28-1321," an arrestee's consent to a warrantless blood draw be voluntary under the totality of the circumstances. *Id.* at 88 ¶ 18. Although this Court assessed the circumstances under which the juvenile defendant assented to the warrantless blood draw after hearing the admonition, including his age, the duration of his detention, the absence of his parents, and his disquieted demeanor, the sufficiency of consent given in response to the admin per se admonition alone was not otherwise before the Court. *Id.* at 88–89 ¶¶ 20–21. Indeed, if it were, the Court could have found the lack of voluntary consent based solely on use of the admonition without discussing other factors. *Id.* at 91 ¶ 32 (Pelander, J., concurring) (noting facts also showed that the juvenile's consent in response to the admonition was voluntary and concluding that "had the juvenile court found [the juvenile's] consent voluntary, I would have had no difficulty affirming that ruling, and I doubt my colleagues would have either"). If anything, *Butler* emphasizes that the totality of the circumstances must be considered in determining compliance with the Fourth Amendment and illustrates that factors such as a juvenile arrestee's age and circumstances can override what otherwise may have been voluntary consent to a blood test following the admonition. *See Butler*, 232 Ariz. at 88 ¶ 18. But it did not implicitly suggest that consent given in response to the admin per se admonition is involuntary, absent other circumstances, as we later held in *Valenzuela II*. 239 Ariz. at 301 ¶ 2.

**¶13**		In sum, *Butler* did not address whether use of the admonition was inherently coercive, did not clearly address its effect, and did not expressly question its validity.  In fact, *Butler* failed to meaningfully acknowledge the two binding appellate cases authorizing use of the language on the admin per se admonition—*Campbell v. Superior Court*, 106 Ariz. 542 (1971), and *State v. Brito*, 183 Ariz. 535 (App. 1995).  Consequently, *Butler* did not "unsettle" the law because it failed to repudiate Arizona appellate courts' existing authorization for use of the admonition.

**¶14**		Although Weakland strives to expand *Butler*'s holding beyond its plain terms, *Valenzuela II* settles the issue and forecloses Weakland's claim that *Butler* "unsettled" the law concerning use of the admin per se admonition.  In *Valenzuela II*, this Court held that *Campbell* and *Brito* constituted binding appellate precedent, sanctioning the language used on the admin per se admonition, and affirmed that "[w]e neither suggested that the admonition . . . misstated the law or was coercive, nor ha[d] this Court ever questioned or overruled *Campbell* or *Brito*."  *Valenzuela II*, 239 Ariz. at 309 ¶ 34.  In doing so, we rejected the argument that continued use of the admin per se admonition reflected "recurring or systemic negligence" in the wake of *Carrillo v. Houser*, 224 Ariz. 463 (2010).  *Id.*  In fact, *Valenzuela II* expressly declined to fault police for "failing to anticipate that we would disapprove the admin per se [admonition] in the wake of *Carrillo*" when *Carrillo* was "not dispositive of the issue" and when Arizona courts had "continued to approve the admonition."  *Id.*  *Valenzuela II* leaves no doubt that, at the time of the decision, Arizona appellate courts had continuously authorized use of the existing admin per se admonition.

**¶15**		That the defendant's arrest in *Valenzuela II* preceded *Butler*, whereas Weakland's arrest followed it, is immaterial to our analysis and conclusion that Arizona's appellate courts continued to authorize use of the admonition at the time of Weakland's arrest.  In fact, *Valenzuela II* cited *State v. Oliver*, No. 2 CA-CR 2014-0359, 2015 WL 4924747 (Ariz. App. Aug. 18, 2015) (mem. decision), involving a post-*Butler* DUI arrest and warrantless blood seizure that occurred after Weakland's arrest, to illustrate the proposition that "our courts have continued to approve the admonition." *Valenzuela II*, 239 Ariz. at 309–10 ¶ 34.  In other words, this Court surveyed the legal landscape pre- and post-*Butler* and concluded that, until its decision in *Valenzuela II*, our appellate courts had continued to authorize use of the admonition.

**¶16**      Indeed, *Oliver* was only one of several post-*Butler* appellate decisions sanctioning police use of the admonition.  *See State v. Valenzuela* (*Valenzuela I*), 237 Ariz. 307, 310 ¶ 7, 315 ¶ 31 (App. 2015); *see also State v. Okken*, 238 Ariz. 566, 571 ¶¶ 17–18 & n.1 (App. 2015) (discussing *Butler* and the statutory requirement of "actual consent before a warrantless search may be performed," yet failing to mention deficiencies with the admonition and focusing, instead, on "other factors" rendering consent involuntary); *State v. Pena*, No. 2 CA-CR 2013-0241, 2014 WL 3407343, at *2 ¶¶ 6–8 (Ariz. App. July 10, 2014) (noting *Butler*'s requirement that a breath test is "subject to the Fourth Amendment's constraints," but citing the admonition as a basis, in part, for valid consent); *State v. Figueroa*, No. 2 CA-CR 2012-0458, 2014 WL 287959, at *4–5 ¶¶ 19–21 (Ariz. App. Jan. 24, 2014) (mem. decision) (citing *Butler* as requiring compliance with the Fourth Amendment for blood draws, but finding that defendant consented, in the absence of police force, after hearing the admonition).[1]  In each of these cases, the court of appeals concluded "that the defendants' consent, obtained in response to the admonition, was voluntary" considering the totality of the circumstances.  *See Weakland*, 244 Ariz. at 84–85 ¶ 23.  The dissents ignore or dismiss these cases.  But if Arizona's appellate courts did not interpret *Butler* as unsettling the law on the use of the admin per se admonition, it would be unreasonable to fault the police for failing to do so.  *See Davis*, 564 U.S. at 241 (stating that "penaliz[ing] the officer for the appellate judges' error" "cannot logically contribute to the deterrence of Fourth Amendment violations" (citations omitted)).

**¶17**      Justice Bolick assails the reasoning and result in *Valenzuela II* concerning the good-faith exception even as he purports to rely upon it.  Specifically, he contends that *Valenzuela II*'s analysis of *Bumper v. North Carolina*, 391 U.S. 543 (1968), and *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973), demonstrates that, after *Bumper*, police should have known that the admin per se admonition was coercive.  *See infra* ¶ 43 (suggesting that because *Bumper* and *Johnson v. United States*, 333 U.S. 10 (1948), directed the

---

[1] Justice Bolick asserts that our notice of these unpublished decisions does not support our position because they cannot constitute binding appellate authority pursuant to Arizona Supreme Court Rule 111(c). *Infra* ¶ 49 n.4. We do not cite these unpublished decisions as authority, but rather as proof of a factual point – that appellate courts continued to approve the admonition after *Butler*.

outcome in *Valenzuela II*, "[i]t is very difficult to argue" that the holding in *Valenzuela II* "should have come as a surprise"). Necessarily, he suggests that *Valenzuela II* wrongly applied the good-faith exception. But Weakland does not urge this Court to overrule *Valenzuela II*, and we see no reason to revisit its holding here.

¶18 *Havatone* offers Weakland no safe harbor. In *Havatone*, this Court declined to apply the good-faith exception to the exclusionary rule when police directed a warrantless blood draw, based on alleged exigent circumstances (dissipation of alcohol in the blood), on an unconscious driver suspected of DUI who had been transported out of Arizona for medical treatment. 241 Ariz. at 508 ¶ 5, 512 ¶ 23. We reasoned that police "should have known that routinely directing blood draws from DUI suspects who were sent out of state for emergency treatment, without making a case-specific determination whether a warrant could be timely secured, was either impermissible or at least constitutionally suspect" because the police practice had "been discredited for over fifty years." *Id.* at 511 ¶ 20, 512 ¶ 24. We noted, further, that "no binding precedents specifically authorized" the police practice. *Id.* at 512 ¶ 28.

¶19 Here, police operated in a distinctly different legal landscape from that in *Havatone*. Unlike there, where courts had discredited the police practice for over fifty years and no binding precedents specifically authorized it, Arizona appellate courts *had* authorized police reliance on the language used in the statutory admin per se admonition for over forty years at the time of Weakland's arrest. And even if *Butler* presaged future court disavowal of the admonition, it did not foreclose its use. *Cf. Leon*, 468 U.S. at 919 n.20 (holding that the good-faith exception requires "a reasonable knowledge of what the law prohibits"). To the contrary, in *Butler*'s wake, Arizona's trial and appellate courts continued to implicitly or expressly authorize use of the admonition.

IV.

¶20 We reaffirm our conclusion in *Valenzuela II* that, until that decision, our courts had continued to authorize use of the admonition. It is unreasonable to require the police to predict a shift in the law when our trial and appellate courts failed to do so. The deterrent purpose of the exclusionary rule does not apply here because the police followed binding appellate precedent that persisted in *Butler*'s wake. We should not

endeavor to divine "unsettled" law where none exists merely to constrain application of the good-faith exception. Such an approach turns the purpose of the exclusionary rule on its head. It is the exclusionary rule, not the good-faith exception to it, that we turn to as a "last resort." *See, e.g.,* *Leon*, 468 U.S. at 918–19 (reasoning that "even assuming that the [exclusionary] rule effectively deters some police misconduct and provides incentives for the law enforcement profession as a whole to conduct itself in accord with the Fourth Amendment, it cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity"). We decline to invoke the rule to penalize the police for what can, at worst, be described as appellate judges' error in continuing to approve consent in response to the admin per se admonition after *Butler*, and we will not prescribe the "bitter pill" of exclusion where we find that police engaged in neither deliberate, reckless, or grossly negligent conduct, nor recurring or systemic negligence. *See Davis*, 564 U.S. at 237, 240–41.

**¶21** We vacate the court of appeals' opinion and affirm Weakland's convictions and sentences.

PELANDER, J., dissenting.

**¶22** I respectfully disagree with the majority's conclusion that the good-faith exception to the exclusionary rule applies to this case.[2] Although I agree with Justice Bolick's conclusion that "the continued use of the admonition alone to establish voluntary consent was of dubious constitutionality following [*State v.*] *Butler*, [232 Ariz. 84 (2013)]," *infra* ¶ 40 (Bolick, J., dissenting), I write separately to explain my reasoning because my approach differs from his.

**¶23** Weakland's consent to a blood draw directly followed the arresting officer's telling her twice, pursuant to an "admin per se" form, that "Arizona law requires you to submit to and successfully complete" the blood test. In *State v. Valenzuela* (*Valenzuela II*), 239 Ariz. 299, 301 ¶ 2, 309 ¶ 33 (2016), we held that "showing only that consent was given in response to this admonition fails to prove that an arrestee's consent was freely and voluntarily given" for providing a blood sample and "cannot excuse the failure to secure a warrant." But we found that "[t]he good-faith exception applie[d]" because the arresting officer "followed binding precedent that had sanctioned use of the admonition read to Valenzuela" at the time of his 2012 arrest. *Id.* at 309 ¶¶ 32–33 (citing *Campbell v. Superior Court*, 106 Ariz. 542, 546 (1971), and *State v. Brito*, 183 Ariz. 535, 538–39 (App. 1995)).

**¶24** The next year, in *State v. Havatone*, 241 Ariz. 506, 512 ¶ 28 (2017), this Court found the good-faith exception inapplicable when "no binding precedents specifically authorized" the practice of warrantless, nonconsensual blood draws from unconscious DUI suspects, and "Arizona case law regarding a per se exigency was, at most, unsettled." I dissented in that case and would have applied the good-faith exception. *Id.* at 521 ¶ 62 (Pelander, J., concurring in part and dissenting in part). But unlike

---

[2] The United States Supreme Court has repeatedly debated the purported costs and benefits of the judicially created exclusionary rule in its Fourth Amendment jurisprudence. *See, e.g.*, *Utah v. Strieff*, 136 S. Ct. 2056 (2016); *Hudson v. Michigan*, 547 U.S. 586 (2006). But this case involves only the good-faith exception to the exclusionary rule, not the underlying purposes, policies, or continued viability of the rule itself, which the Supreme Court still recognizes. And, as the majority acknowledges, the State "bears the burden of establishing that the good-faith exception applies." *Supra* ¶ 7.

*Havatone*, this case does not involve "a presumptively valid state statute" that "specifically and expressly" authorized the practice in question. *Id.* at 515 ¶ 38, 521 ¶ 63 (citing A.R.S. § 28-1321(C)). Nor does application of the exclusionary rule in this case impose on officers an "expect[ation] to anticipate or predict a future change in our case law." *Id.* at 521 ¶ 63.

¶25 More recently, addressing facts predating *United States v. Jones*, 565 U.S. 400 (2012), this Court found the good-faith exception applied to officers' installation of a GPS device on a suspect's vehicle in 2010. *State v. Jean*, 243 Ariz. 331, 342–43 ¶¶ 40–47 (2018). We reasoned that the officers conducted the search "in objectively reasonable reliance" on prior, binding United States Supreme Court cases, *id.* at 343 ¶ 47, and we rejected the argument that "to qualify as 'binding appellate precedent under *Davis* [*v. United States*, 564 U.S. 229 (2011)],' a case 'must specifically authorize the precise conduct under consideration,'" *id.* ¶ 45 (quoting *United States v. Katzin*, 769 F.3d 163, 176 (3d Cir. 2014)).

¶26 One could argue, as the amicus curiae Arizona Attorneys for Criminal Justice does, that some tension exists between *Havatone* and *Jean*. *Havatone* interpreted and applied the good-faith exception narrowly, finding "recurring or systemic negligence" that precluded application of the exception, 241 Ariz. at 511 ¶ 21, in part because "Arizona case law in effect at the time of Havatone's blood test did not specifically authorize[]" the precise conduct at issue, namely, the "particular police practice of directing warrantless, nonconsensual blood draws from unconscious DUI suspects absent exigent circumstances," *id.* at 513 ¶ 30 (alteration in original) (citation omitted) (internal quotation marks omitted); *see also id.* at 512 ¶ 24. *Jean*, in contrast, took a less restrictive view, concluding that the good-faith exception applied because "the rationale underpinning" the prior Supreme Court precedent authorized the limited GPS monitoring in that case, even though the Court had not specifically authorized that precise conduct but only similar conduct in beeper cases. 243 Ariz. at 343 ¶ 45 (internal quotation marks omitted). These divergent views regarding the scope of the good-faith exception are also illustrated in the majority and dissenting opinions in *Jean*. *Compare id.* at 342–43 ¶¶ 40–47, *with id.* at 343–45 ¶¶ 49–57 (Bales, C.J., dissenting in part and dissenting from the judgment).

¶27 Importantly, contrary to Justice Bolick's suggestion, *infra* ¶ 48, *Davis* does not resolve this dispute. The outcome in *Davis* is consistent with either approach, and language in *Davis* supports both views. In *Davis*,

police officers engaged in the precise conduct specifically authorized by Eleventh Circuit precedent. 564 U.S. at 239. The Court concluded that relying on that precedent to engage in the same conduct authorized by it was objectively reasonable. *Id.* at 239–41. But the Court did not limit application of the good-faith exception to those circumstances. Instead, it broadly held that "the exclusionary rule does not apply" "when the police conduct a search in objectively reasonable reliance on binding appellate precedent," without setting forth the boundaries of that rule. *Id.* at 249–50; *see also id.* at 232.

¶28　　　In my view, *Jean*'s formulation and application of the good-faith exception is correct and better serves the values supporting the exclusionary rule and this exception to it. *See Davis*, 564 U.S. at 240, 249; *Jean*, 243 Ariz. at 343 ¶ 46. Thus, I agree with the majority on that point. *See supra* ¶ 9. In a world with evolving technology and limited judicial resources, the validity of police officers' conduct should not hinge on appellate courts previously having specifically authorized every particular practice that officers might engage in or bear the risk that evidence will be suppressed if a practice is subsequently declared unconstitutional. This, of course, is especially true when a police officer can reasonably interpret those appellate decisions that do exist as authorizing related or similar practices based upon the rationales, principles, and reasoning that those decisions set forth. Under those circumstances, it is hard to understand what the deterrent value is in suppressing evidence when a future court later determines that a practice is unconstitutional. As this Court aptly observed in *Jean*, "*Davis* requires good faith and reasonableness, not a crystal ball." 243 Ariz. at 343 ¶ 45.

¶29　　　Any disparity between *Havatone* and *Jean*, however, is inconsequential and neither affects nor changes the outcome here. Under either approach to the good-faith exception, *Butler* sufficiently unsettled the aggregate of relevant Arizona case law relating to police officers' use of this "admin per se" form to preclude application of the exception in this case. Applying *Havatone*, Justice Bolick's dissent explains why, at the time of Weakland's post-*Butler* arrest in 2015, "a blanket policy to read the admonition but not to otherwise establish consent could not have been made in good faith, and therefore the good-faith exception to the exclusionary rule should not apply." *Infra* ¶ 53. But in reaching that conclusion, Justice Bolick's dissent implicitly questions the reasoning and

13

result in *Valenzuela II* and disregards *Jean*, while neither the majority nor I do. *See supra* ¶¶ 9, 17.

¶30    Nonetheless, the same conclusion obtains under *Jean*. The rationale, principles, and reasoning underlying this Court's analysis in *Butler* undermine the State's claim that the aggregate of relevant Arizona case law at the time of Weakland's arrest could reasonably be understood as authorizing the practice of obtaining constitutionally adequate consent to blood testing by reading an "admin per se" form to an arrestee that instructs the arrestee that he or she is "require[d]" to submit to testing. Three reasons support this conclusion.

¶31    First, *Butler* expressly rejected the notion that Arizona's implied consent statute "requires" a person to submit to blood testing, which directly contradicts the language in the "admin per se" form later used when Weakland was arrested. This Court stated that the "consent" under that statute "does not always authorize warrantless testing of arrestees." *Butler*, 232 Ariz. at 88 ¶ 17 (quoting *Carrillo v. Houser*, 224 Ariz. 463, 465 ¶ 10 (2010)). Rather, we stated that the implied consent law directs an officer "to *ask* the arrestee to submit to the test, and the arrestee *may then refuse* by declining to expressly agree to take the test." *Id.* (emphasis added). "*If the arrestee refuses*, the statute specifies that *a warrant is required* to administer the test and the arrestee shall have his license suspended." *Id.* (emphasis added). These statements cannot reasonably be understood in good faith as authorizing an officer to admonish DUI arrestees that they are "require[d]" to submit to testing.

¶32    Second, *Butler* held that "independent" of the implied consent statute, "the Fourth Amendment requires an arrestee's consent to be voluntary to justify a warrantless blood draw." *Id.* ¶ 18. That statement cannot reasonably be understood in good faith as authorizing an officer to assume or infer that an arrestee's consent for Fourth Amendment purposes is voluntary based solely on (i.e., entirely *dependent* upon) the fact that the arrestee submitted to testing pursuant to an admonition that, for the reasons discussed above, *Butler* concluded erroneously misstates the implied consent statute.

¶33    Third, in support of the *Butler* trial court's finding that voluntary consent was lacking in that case, we noted that the officer (pursuant to the admin per se form) had twice told the suspect that he was "required to submit" to blood testing. *Id.* at 89 ¶ 20. Far from authorizing

the practice of reading that form to an arrestee and then assuming or implying based on that fact alone that the arrestee's subsequent submission to testing constituted voluntary consent, this Court included that precise fact as a reason for upholding the trial court's finding that the suspect's consent was *involuntary*. Our including that fact as a reason for finding an arrestee's consent involuntary for Fourth Amendment purposes cannot reasonably be understood in good faith as authorizing an officer to obtain constitutionally adequate consent to blood testing by reading an "admin per se" form to an arrestee that instructs the arrestee that he or she is "require[d]" to submit to testing.

**¶34** The majority contends, however, that "*Butler* did not 'unsettle' the law." *Supra* ¶ 13. According to the majority, "the sufficiency of consent given in response to the admin per se form alone" was not at issue in *Butler*, *supra* ¶ 12, and that case "failed to meaningfully acknowledge the two binding appellate cases authorizing use of the language on the admin per se form—*Campbell v. Superior Court*, 106 Ariz. 542 (1971), and *State v. Brito*, 183 Ariz. 535 (App. 1995)." *Supra* ¶ 13. These assertions are unpersuasive.

**¶35** *Butler* did address the sufficiency of consent after the admonition—indeed, we expressly rejected the State's arguments that "the 'consent' in § 28-1321(A) either constitutes an exception to the warrant requirement or satisfies the Fourth Amendment's requirement that consent be voluntary." 232 Ariz. at 88 ¶ 17. Because the minor involved in *Butler* did consent—both verbally and in writing—after being given the per se admonition, *see id.* at 86 ¶ 4, our affirming the juvenile court's ruling that the consent nonetheless was involuntary necessarily implies that the mere fact that a suspect agrees to the test after the admonition does not suffice to establish voluntariness. With respect to *Campbell* and *Brito*, neither of those cases expressly discussed whether, apart from the implied consent statute, voluntary consent is required for a warrantless blood draw or whether acquiescence to a blood draw after the admonition itself establishes such consent (the issues *Butler* did decide). Thus, the majority's assertion that *Butler* failed to acknowledge "binding appellate cases" is incorrect. *Supra* ¶ 13. Indeed, in *Butler* the State did not contend that *Campbell*—much less *Brito*—somehow established that the consent involved in *Butler* was voluntary. Thus, there was no reason in *Butler* to discuss *Campbell* or *Brito* because they were not pertinent to the issues before the Court, much less "binding." Although those cases justified an officer's good-faith use in 2012

15

of the admin per se form that contained the "Arizona law requires" language, *see Valenzuela II*, 239 Ariz. at 301 ¶¶ 4–5, 309–10 ¶¶ 32–34, that cannot be said post-*Butler* for the 2015 arrest and search of Weakland here.

**¶36** Application of the good-faith exception in this case requires the Court to take an even broader view of that exception than set forth in *Jean*. In *Jean*, we applied the good-faith exception because "the rationale underpinning" prior Supreme Court precedent could be logically and reasonably extended from beepers to GPS monitoring. 243 Ariz. at 343 ¶ 45 (quoting *Katzin*, 769 F.3d at 173–74). Significantly, though, at the time of the police officers' GPS monitoring in *Jean*, no United States Supreme Court case had explicitly or implicitly overruled or questioned its prior case law or otherwise suggested that GPS monitoring might be or likely is impermissible. That is precisely what made the officers' reliance on "the rationale underpinning" the prior cases reasonable. Stated differently, the officers in *Jean* could extract principles from the beeper cases and reasonably extend those principles to a new fact pattern, GPS monitoring, but they did so without ignoring authority cutting the other direction. Under those circumstances, this Court correctly found no deterrent value in suppressing the GPS monitoring evidence and correctly applied the good-faith exception. *Id.* ¶¶ 45–47.

**¶37** But that is not the situation here. If we assume (and absent any facts in the record, we can only assume) that the police officer in this case relied on this Court's interpretation of the implied consent statute in *Campbell* (a 1971 decision) and the court of appeals' decision in *Brito* (a 1995 decision), the officer did so while ignoring this Court's contrary interpretation of the implied consent statute and analysis of constitutionally adequate consent in a subsequent, and much more recent, case. *Butler* (our 2013 decision) plainly cast doubt on whether the "admin per se" form accurately stated the law and whether a person's submission to testing after merely being read those admonitions could constitute voluntary consent for purposes of the Fourth Amendment, obviating the need for a search warrant.[3] Unlike in *Jean*, arguably there was authority on both sides of the

---

[3] Indeed, given this Court's ruling in *Butler*, I warned that "the safest course of action for law enforcement might simply be to obtain search warrants, when reasonably feasible, for obtaining blood samples in DUI investigations." 232 Ariz. at 92 ¶ 37 (Pelander, J., concurring). Had that

scale here. Furthermore, unlike in *Davis*, the police officers did not follow, act in "strict compliance" with, or "scrupulously adhere[]" to the aggregate of relevant Arizona case law "to the letter." 564 U.S. at 239, 249. Nor could they have done so because the relevant law was, at best, unclear. But rather than "err on the side of constitutional behavior," *Havatone*, 241 Ariz. at 513 ¶ 29 (quoting *United States v. Johnson*, 457 U.S. 537, 561 (1982)), the officer proceeded in the face of "unsettled" law, *id.* at 512 ¶ 28.

**¶38** Therefore, under these circumstances, unlike in *Jean* and *Davis*, there is deterrent value in suppressing the blood draw evidence. Although *Havatone*, in my view and the majority's, interpreted the good-faith exception too narrowly, this Court correctly stated there that in "'close' cases" police officers should err on the side of protecting citizens' constitutional rights. *See id.* at 513 ¶ 29 (quoting *Johnson*, 457 U.S. at 561). The arresting officer did not do so here.

**¶39** Finally, in determining for Fourth Amendment purposes whether a DUI arrestee's consent was voluntary, we consider the totality of circumstances, which might include but are not necessarily limited to the arrestee submitting to blood testing after being given the (now invalid) "required by law" admonition. *See Valenzuela II*, 239 Ariz. at 305–06 ¶ 21 (holding that "a trial court should examine the totality of the circumstances to decide whether consent was voluntary, even when given after a law enforcement officer's assertion of lawful authority to search"); *Butler*, 232 Ariz. at 87 ¶ 13 ("Voluntariness is assessed from the totality of the circumstances."). In this case, however, the record does not reflect any facts that bear on or might support a finding of voluntary consent other than Weakland's submission to blood testing after the "required by law" admonition was given to her. And, at oral argument in this Court, the State conceded that no other facts suggest voluntary consent under the totality of circumstances. Accordingly, I respectfully dissent from the majority's holding that the good-faith exception applies to this case and would instead apply the exclusionary rule and reverse the trial court's order denying Weakland's motion to suppress.

---

warning been heeded almost two years later when Weakland was arrested, the State's reliance on the good-faith exception would be unnecessary.

BOLICK, J., joined by BALES, C.J., dissenting.

**¶40**   The sole question before the Court is whether, following our decision in *State v. Butler*, 232 Ariz. 84 (2013), it was objectively reasonable for a police department to view acquiescence to the admonition at issue, standing alone, to establish voluntary consent to a blood draw, thus allowing admission of the blood test as evidence notwithstanding that the search violated Weakland's constitutional rights. Because the continued use of the admonition alone to establish voluntary consent was of dubious constitutionality following *Butler*, I respectfully dissent.

**¶41**   In *Davis v. United States*, the U.S. Supreme Court held that evidence resulting from an unconstitutional search would be suppressed unless the police were acting in good faith on "binding appellate precedent [that] specifically *authorizes* a particular police practice." 564 U.S. 229, 241 (2011). In *State v. Havatone*, we held that "[w]hen the Fourth Amendment violation occurred not as the result of an officer's fact-specific determination that obtaining a warrant is infeasible but pursuant to department practice making such determination unnecessary, we impute to the law enforcement agency the responsibility to assure that unlawful seizures will not occur." 241 Ariz. 506, 511 ¶ 22 (2017) (citing *Davis*, 564 U.S. at 240). Application of the exclusionary rule where the law is "unsettled," or the constitutionality of a practice is "dubious," provides deterrence against unconstitutional behavior. *Id.* at 512–13 ¶ 29. Indeed, if the rule "is not applied in 'close' cases, 'law enforcement officials would have little incentive to err on the side of constitutional behavior.'" *Id.* at 513 ¶ 29 (quoting *United States v. Johnson*, 457 U.S. 537, 561 (1982)).

**¶42**   The use of the admonition alone to establish voluntary consent was questionable long before *Butler*. The U.S. Supreme Court held in *Bumper v. North Carolina* that "[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." 391 U.S. 543, 548–49 (1968) (footnote omitted). Yet that is exactly the practice on which the majority bases the good-faith exception here, fifty years later.

¶43        Indeed, when we ruled the practice unconstitutional in *State v. Valenzuela* (*Valenzuela II*), the Court acknowledged that it was applying well-settled law when it stated that "[t]he *Bumper* line of cases survives to invalidate any consent given only in acquiescence to an assertion of a lawful authority to search."  239 Ariz. 299, 304 ¶ 17 (2016) (citing *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion)).  The Court read *Bumper* and *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973), in tandem "as requiring a court to examine the circumstances surrounding an assertion of lawful authority to search to determine whether the consent was sufficiently independent of the assertion to remove its taint.  If not, the consent was not freely and voluntarily given."  *Valenzuela II*, 239 Ariz. at 304 ¶ 17.  In concluding that the State failed to meet its burden to demonstrate that Valenzuela's consent to the tests was voluntary, the Court remarked that "*Bumper* and *Johnson* [*v. United States*, 333 U.S. 10 (1948)] direct this outcome."  *Valenzuela II*, 239 Ariz. at 306 ¶ 22.  It is very difficult to argue that an outcome directed by decisions more than a half-century ago should have come as a surprise.

¶44        After our ruling in *Butler*, reliance solely on acquiescence to an admonition asserting legal authority to establish voluntariness was even more untenable.  At the very least, the law was at best unsettled, which is an insufficient basis for the good-faith exception to the exclusionary rule.  *See Havatone*, 241 Ariz. at 512–13 ¶ 29; *see also United States v. Lara*, 815 F.3d 605, 613 (9th Cir. 2016) (holding the good-faith exception does not apply where "the appellate precedent, rather than being binding, is (at best) unclear").  In *Butler*, the State argued that tests administered under A.R.S. § 28-1321 were not subject to a Fourth Amendment voluntariness analysis—an argument we rejected.  232 Ariz. at 87 ¶¶ 9–10.  And we rejected the State's argument that "consent" in the statute satisfies the Fourth Amendment's requirement that consent be voluntary.  *Id.* at 88 ¶¶ 17–18.  We held that, based on the totality of the circumstances, "the Fourth Amendment requires an arrestee's consent to be voluntary to justify a warrantless blood draw."  *Id.* ¶ 18.  Given that it was already well established that a prosecutor could not prove voluntariness based solely on assertion of authority, it should have been clear after *Butler* that acquiescence to the admonition alone would not suffice.  Indeed, it is difficult to imagine a lawyer advising a police department that *Butler* raised no serious doubt about such a policy.

¶45 The majority does not dispute that the police should not rely on unsettled doctrine. Instead, it asserts that the term "unsettled" is "opaque," *supra* ¶ 10, which it is not. *See Unsettled*, Webster's Third New International Dictionary (3d ed. 2002) (defining "unsettled" as "not decided or determined" or "not resolved or worked out"). The majority contends that *Butler* did not leave the law unsettled because *Butler* "did not address whether use of the admonition was inherently coercive, did not clearly address its effect, and did not expressly question its validity." *Supra* ¶ 13. The majority is conflating two distinct issues: (1) whether acquiescence in a search after the admonition establishes that it was voluntary for Fourth Amendment purposes without regard to other circumstances, a proposition *Butler* clearly rejects; and (2) whether the use of the admonition is inherently coercive and any consent given in response is therefore involuntary, the issue later addressed in *Valenzuela II*. The holding in *Butler* on the first issue was sufficient to cast doubt on resolution of the second issue. The Court noted that even under § 28-1321(A), "the officer is directed to ask the arrestee to submit to the test, and the arrestee may then refuse by declining to expressly agree to take the test. . . . We hold now that, independent of § 28-1321, the Fourth Amendment requires an arrestee's consent to be voluntary to justify a warrantless blood draw." *Butler*, 232 Ariz. at 88 ¶¶ 17–18. Weakland's arrest was after *Butler*, and consent was not voluntarily conferred, as required by *Butler*. Thus, the warrantless blood draw, which all now concede was unconstitutional, could not have occurred in good faith.

¶46 The majority then says that "even if *Butler* presaged future court disavowal of the admonition, it did not foreclose its use." *Supra* ¶ 19. That depiction states the constitutional equation backward: we do not determine good faith based on whether the police have engaged in a practice the courts have clearly foreclosed, but rather on whether the courts have expressly authorized the practice. *Davis*, 564 U.S. at 241. And it is not enough if the question is debatable. *See Havatone*, 241 Ariz. at 512–13 ¶ 29. The exclusionary rule's deterrent effect against unconstitutional warrantless searches is hardly advanced if the state can avoid consequence merely by plausibly asserting that it did not read binding precedent as unequivocally foreclosing a particular practice.

¶47 The majority counters that "Arizona appellate courts *had* authorized police reliance on the language used in the statutory admin per se admonition for over forty years at the time of Weakland's arrest." *Supra*

20

¶ 19.   Indeed, courts frequently focused on the admonition's language, especially in the context of suspending a driver's license for failure to consent.  But what our courts have never done, and what is at issue here, is to authorize the use of the admonition, standing alone, to establish voluntary consent under the Fourth Amendment, precisely the issue presented in *Butler*.  Absent such authority, or in light of an unsettled state of law, we should not find the good-faith exception applicable.

**¶48**      The majority contends we were wrong in *Havatone* to require binding appellate authority specifically authorizing the practice in question, instead preferring the more flexible good-faith standard articulated in *State v. Jean*, 243 Ariz. 331 (2018).  *Supra* ¶ 9.  Of course, the requirement of binding appellate precedent specifically authorizing the practice in question originated not in *Havatone* but in the U.S. Supreme Court's decision in *Davis*.  *See* 564 U.S. at 241.  Regardless, Justice Pelander, who authored the relevant standard in *Jean*, points out in his separate dissenting opinion that under either the *Jean* or *Havatone* standard, it is clear that "*Butler* sufficiently unsettled the aggregate of relevant Arizona case law relating to police officers' use of this 'admin per se' form to preclude application of the exception in this case."  *Supra* ¶ 29.

**¶49**      The majority contends, *supra* ¶ 13, that the requisite binding appellate authorization is supplied by *Campbell v. Superior Court*, 106 Ariz. 542 (1971), and *State v. Brito*, 183 Ariz. 535 (App. 1995), *abrogated by Valenzuela II*, 239 Ariz. 299, which as the Court observed in *Valenzuela II* had not been "questioned or overruled," 239 Ariz. at 309 ¶ 34.[4]  But neither case provides the express authorization necessary to avoid consequence for the Fourth Amendment violation.

**¶50**      In *Campbell*, the Court considered various challenges to the implied consent law in the context of a DUI suspect's refusal to take a breath test, which resulted in a suspended license. 106 Ariz. at 544–45.  As relevant here, the Court concluded in a single sentence that the statute did not violate the Fourth Amendment.  *Id.* at 554 (citing *Schmerber v. California*, 384

---

[4]   The majority also cites unpublished court of appeals decisions that ostensibly support its position that appellate decisions sanctioned police use of the admonition.  *Supra* ¶ 16.  But they cannot constitute the requisite binding appellate authority required to trigger the application of the good-faith exception.  *See* Ariz. R. Sup. Ct. 111(c).

U.S. 757 (1966)). Nor have we ruled the statute unconstitutional in *Valenzuela II* or here. The Court's core holding in *Campbell*, applicable in the context of a *civil* proceeding, was that it is "reasonable under the circumstances to require a person to submit to a chemical test of his blood, brea[t]h or urine if arrested for driving while intoxicated or face a six months suspension of his driver's license." 106 Ariz. at 546. No warrant or voluntariness issues were before the Court in *Campbell*, and no issues relating to civil penalties are before us here. Given the markedly different context and issues presented, *Campbell* provides scant (if any) support for the proposition that acquiescence to the admonition establishes voluntary consent.

¶51 In *Brito*, the court of appeals dealt with a criminal defendant who also refused to take a breath test—again presenting no issues involving consent or warrants. 183 Ariz. at 537. Rather, the defendant argued that the admonition misstated the law. *Id.* at 538. It is somewhat difficult to understand the court's holding, for it says both that a defendant does not have an "unfettered right to refuse" the tests, but also that "he may refuse the request" although "the refusal has consequences." *Id.* Regardless, like *Campbell*, the opinion says nothing about when a warrant is required or whether acquiescence to the admonition establishes voluntariness. Thus, neither decision authorizes reliance on the admonition to establish consent.

¶52 Our subsequent discussions of *Butler* demonstrate that the decision, at the least, unsettled the law. In *Havatone*, we emphasized that *Butler* held that § 28-1321 "does not relieve the state of establishing voluntary consent . . . to justify warrantless blood draws from DUI suspects." 241 Ariz. at 510 ¶ 16 (citing *Butler*, 232 Ariz. at 87–88 ¶¶ 12–13, 18). In *Valenzuela II*, the Court observed that "we have rejected the contention that the implied consent law operates to prospectively provide consent to a search for Fourth Amendment purposes." 239 Ariz. at 307 ¶ 25 (citing *Butler*, 232 Ariz. at 88 ¶ 18). The Court stated that it has "focused on the totality of the circumstances, *including but not limited to an officer's reading of an admin per se form*, in determining whether a DUI suspect's consent to search was freely and voluntarily given." *Id.* at 305 ¶ 20 (emphasis added) (citing *Butler*, 232 Ariz. at 88–89 ¶¶ 19–20). Given these apt readings of *Butler*, it is difficult to apprehend *Valenzuela II*'s holding as upending settled and binding appellate precedent rather than as a logical next step that resolved any lingering uncertainty.

**¶53**  By the time of Weakland's 2015 arrest, our decisions clearly established that the implied consent statute "generally does not authorize law enforcement officers to administer the test without a warrant unless the arrestee expressly agrees to the test," *Carrillo v. Houser*, 224 Ariz. 463, 463 ¶ 1 (2010); and that constitutionally, the State must prove under the totality of the circumstances that the consent was voluntary and express, and not merely implied, *Butler*, 232 Ariz. at 88 ¶¶ 18–19.  At that point, a blanket policy to read the admonition but not to otherwise establish consent could not have been made in good faith, and therefore the good-faith exception to the exclusionary rule should not apply.  At the same time, excluding the evidence here would incentivize law enforcement officials to more carefully monitor and apply the law, to err on the side of obtaining a warrant, and therefore to avoid the need for a court to exclude evidence in future cases.

**¶54**  The majority's opinion significantly expands the good-faith exception.  Instead of requiring binding appellate precedent that expressly authorizes the practice, it finds good faith where there is a smidgeon of authority and an abundance of doubt.  As Justice Pelander aptly characterizes it, instead of erring on the side of constitutional behavior, the police "proceeded in the face of 'unsettled' law." *Supra* ¶ 37.  For those reasons, with great respect to my colleagues, I dissent.